CASE 79—ACTIONS BY S. A. PANNELL AND OTHERS AGAINST THE LOUISVILLE TOBACCO WAREHOUSE Co. TO RECOVER PENALTIES FOR A VIOLATION OF A STATUTE, CONSOLIDATED WITH AN ACTION BY THE LOUISVILLE TOBACCO WAREHOUSE Co. AGAINST S. A. PANNELL AND OTHERS, TO ENJOIN THE PROSECUTION OF SUCH ACTIONS.—JUNE 6.

# Pannell, &c. v. Louisville Tobacco Warehouse Company, &c.

APPEAL FROM JEFFERSON CIRCUIT COURT, COMMON PLEAS DIVISION.

JUDGMENT DISMISSING THE ACTIONS BROUGHT BY S. A. PANNELL AND OTHERS. AND GRANTING THE LOUISVILLE TOBACCO WAREHOUSE Co. AN INJUNCTION, AND S. A. PANNELL AND OTHERS APPEAL. REVERSED.

TOBACCO WAREHOUSEMAN—POWER OF LEGISLATURE TO REGULATE CHARGES—REASONABLE COMPENSATION—REPEAL OF STATUTE—ENFORCEMENT OF PENALTIES.

Held: 1. Kentucky Statutes, section 4799, providing that a tobacco warehouseman, in settling with a shipper, shall account to him for the net weight of the tobacco sold, including the sample, is reasonable and valid, as it in substance provides that the buyer shall pay for all the tobacco he gets, and that the warehouseman shall account for all the tobacco he is paid for.

2. The court will not refuse to enforce a statute fixing the rates to be collected by tobacco warehousemen, unless it presents such a flagrant attack upon the rights of property under the guise of regulation as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use.

Pannell, &c. v. Louisville Tobacco Warehouse Co., &c.

3. The mere opinions of witnesses, without the facts on which they are based, are of very little value, especially where the witnesses are by situation or interest biased, and not impartial

4. A scale of fees which is so large as to justify warehousemen in expending large sums to secure trade may properly be reduced, as it is not the policy of the law that warehousemen should be allowed to charge shippers large fees that they may be able to spend a portion of them in securing the trade.

5. A statute fixing rates under which tobacco warehousemen will get about $4.35 a hogshead for selling tobacco, including resales and outage fees, is not unreasonable, especially in view of the fact that the warehousemen, under their own regulations, perhaps receive- in many cases less than the statute allows. as it can not be presumed that they voluntarily cut down their charges below a fair price.

6. Where a statute repealing a former statute expressly provides that no penalty provided by the repealed statute "shall hereafter be recoverable in any court of this Commonwealth," the courts have no power thereafter to render judgment for such a penalty, notwithstanding Kentucky Statutes, section 465, which provides that no new law "shall be construed" to repeal a former law as to any penalty incurred thereunder.

7. Const., section 59, providing that the General Assembly shall not pass local or special acts "to remit fines, penalties or forfeitures," does not prohibit the Legislature from repealing an existing statute, and giving to the repeal its common law effect of taking away from the courts the power to enforce penalties incurred thereunder, as the Legislature, unlike the congress, has all power that is not expressly taken away from it.

McCANDLESS & JAMES, FOR APPELLANTS.

HUMPHREY, BURNETT & HUMPHREY FOR APPELLEES.

(No briefs in the record.)

OPINION OF THE COURT BY JUDGE HOBSON—REVERSING.

In the year 1900 the appellants instituted a number of suits at law to recover penalties for the violation of sec-tions 4799, 4801, 4803, Kentucky Statutes. Section 4799 provides that a warehouseman, in settling with a shipper, shall account to him for the net weight of the tobacco sold, including the sample; section 4801, that the warehouseman, in selling leaf tobacco at public auction, shall receive as

compensation therefor $2 a hogshead from the owner or his agent; section 4803, that it shall be unlawful for the warehouseman directly or indirectly to charge the seller or owner anything by way of commission or otherwise for paying to him the money for which his tobacco is sold. Section 4807 makes the warehouseman liable to the party aggrieved in the sum of not less than $25 nor more than $100 for a violation of these provisions. Appellees are warehousemen in Louisville, Ky., and appellants are sellers of tobacco. The actions instituted by appellants sought to recover penalties for violation of the foregoing sections by the warehousemen in not accounting to the shipper for the full weight of his tobacco, and in charging him commission on the price in addition to the $2 a hogshead for selling it. After these suits had been filed, appellees filed a petition in equity in the Jefferson circuit court, in which they enjoined appellants from the prosecution of the actions to recover the penalties on the ground that the statute is contrary to the State and federal Constitutions, and operates to deprive appellees of their property. We do not perceive that there is any violation of the State Constitution if the rates fixed by the act are not so low as to operate as a taking of private property for public use without just compensation. From the foundation of the State the Legislature has exercised the power of control over the selling of tobacco in public warehouses, which, from the beginning, has been one of its staple crops. While the State was yet a part of Virginia, during the Revolutionary War, regulations on this subject were prescribed. Similar acts were passed in this State soon after its creation, and have from time to time been amended and extended. See Appendix, 3 Litt. Ky. Laws, pp. 580, 582; 1 Ky. St. Laws, 88, 136, 137; 2 Ky. St. Laws, 137; 3 Ky.

St. Laws, 227; Meyers' Supp. Rev. St., pp. 520, 523, 526; Gen. St. (Feland's Ed., 1887) p. 1265. In view of this legislative policy, the present Constitution of the State provides: "All elevators or storehouses, where grain or other property stored for a compensation, whether the property stored be kept separate or not, are declared to be public warehouses, subject to legislative control, and the General Assembly shall enact laws for the inspection of grain, tobacco and other produce, and for the protection of producers, shippers and receivers of grain, tobacco and other produce." Section 206. At the time of the adoption of the Constitution the power of the Legislature to regulate tobacco warehouses had been expressly sustained. Nash v. Page, 80 Ky., 539 (4 R., 77) 44 Am. Rep., 490. This was recognized by the provision of the Constitution just quoted, which was intended to require the Legislature to enact proper laws on the subject. The statute referred to was passed pursuant to it, and does not differ essentially from the previous acts, except that it cuts down somewhat the compensation of the warehouseman. The validity of the statute was assumed by the court in Warehouse Co. v. Minor (21 R., 990) (53 S. W., 641), and in Wrightson, &c., v. Gardner 89 Ky., 454 (17 R., 1345) 33 S. W., 622, 35 S. W., 1116; but in neither of these cases was the precise question made that is now presented.

It is shown by the evidence that for years a custom has existed among the warehousemen to deduct from the net weight of the tobacco 10 pounds for sample, and to settle with the seller on this basis, although the sample in fact weighs about 5 pounds less, and the warehouseman collects from the buyer for the entire net weight of the tobacco, less the actual weight of the sample. In other words, it is shown that the warehouseman, as the agent of the sel-

ler, collects from the buyer the price for about 5 pounds
more of tobacco on each hogshead than he accounts to the
seller for.   It is also shown that the buyer gets the sample,
which usually weighs about 5 pounds, and for this, by the
custom, he pays nothing.   The warehouseman, in selling
the tobacco of his principal, should account to him as his
agent for all the money he in fact receives for it, and any
rule of the tobacco exchange allowing him to account for
a less number of pounds than he in fact receives from the
buyer is unreasonable and void.   The rule was also in vio-
lation of the act of March 8, 1876.   That act made a viola-
tion of its provisions a misdemeanor punishable by a fine
of not less than $50 nor more than $100.   As this was not
effective, the act complained of prescribed a penalty recover-
able by the seller or party aggrieved.   Section 4799, Ken-
tucky Statutes, simply provides, in substance, that the
buyer shall pay for all the tobacco he gets, and that the
warehouseman shall account for all the tobacco that he is
paid for.   We are unable to see any objection to this sec-
tion on constitutional grounds, and are of opinion that the
circuit court improperly sustained the injunction in so
far as it sought to recover a penalty for a violation of this
section.

It is shown by the proof that, in addition to the charges
made by the warehouseman against the seller, he also
charges the buyer what is known as an "outage fee."   This
is not a charge for the selling of the tobacco, but covers the
services of the warehouseman in having the hogsheads re-
coopered and stored for the buyer for a reasonable time
until he is ready to receive them.   By the custom of the
trade, the buyer has 15 days for this purpose, and after
this he is charged storage.   The outage fee charged the
buyer is $2.   The statute does not affect this charge; it

only regulates the charges to be paid by the seller. As shown by the proof, the only reduction in charges under the statute from those made by the warehousemen under their rules is that the statute cuts off a charge of 1 per. cent. commission on the amount of the sale which the warehouseman collected from the seller, and reduced the charge for reselling a hogshead of tobacco from $2 to $1.50. As a hogshead of tobacco ordinarily sells for from $50 to $100 on an average, the 1 per cent. commission would amount to from 50 cents to $1 on a hogshead. Something like one-fourth of the sales are rejected, and on these resales of one-fourth of the tobacco under the statute the charge would be for selling these hogsheads $3.50, instead of $4, as under the rule. The statute would, therefore, make a net reduction of the fees charged by the warehouse of something like $1 on the hogshead, and the question presented is, would such a reduction of their fees amount to a taking of their property for public use without just compensation, or deprive them of their property without due process of law? The right of the State to prescribe reasonable rates is unquestionable. The only question is whether the rates prescribed are so unreasonable as to be in their nature confiscatory. The rule is that the judiciary will not interfere with the collection of rates established under legislative sanction, "unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as, under all the circumstances, is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents clearly and beyond all doubt such flagrant attack upon the rights of property under the guise of regulation as to compel the court to say that the rate prescribed will necessar-

ily have the effect to deny just compensation for private property taken for the public use." San Diego Land & Town Co v. City of National City, 174 U. S., 753, 19 Sup. Ct., 804, 43 L. Ed., 1154.

Under the statute, including the resales and the outage fees, the warehouseman will get about $4.35 a hogshead for selling. In addition to this, there is a profit on storage, insurance, drayage, and other matters, that is considerable, and will probably amount to 30 or 40 cents a hogshead. The cost of selling, according to the proof, is from $3.60 to $4.20; but in this are included, according to the statements of the only witness who furnishes us his figures, some items of questionable correctness. A great many witnesses have testified, giving it as their opinion that business can not be done under the statute; but, when their statements are analyzed, it is found that their conclusions are largely based on other provisions than those in controversy. The proof in the case, with the exception of one single deposition, was all taken in a suit pending in the Graves circuit court about the year 1896, and only the proof taken for the warehousemen in that case is before us. The mere opinions of witnesses without the facts on which they are based are of very little value, and this is especially true where the witnesses are, by situation or interest, biased and not impartial. About 175,000 hogsheads are sold annually by appellees. But a short time is taken to sell a hogshead, and it is hard to escape the conviction, from the proof, that there is a very bitter rivalry between them to secure trade, and that this rivalry is somewhat promoted by the scale of fees that are charged under the rules. In other words, the rules allow a liberal compensation, and it is a matter of importance to the warehouse to secure the trade of a customer, and in order to secure

trade the houses expend large amounts in the country. If the business was not so remunerative, they could not afford to expend as much as is shown by the proof in securing it, and we do not think it can be maintained that a scale of fees which is so large as to justify the warehouseman in expending large amounts to secure trade might not be properly reduced. For we know that the larger the fee, the more the warehouseman can afford to pay out to get the trade; and it is not the policy of the law that the warehouseman should be allowed to charge a large fee against the shipper, in order that he may be able to spend a portion of it in securing the trade. To illustrate: If the fees were so large that the warehousemen could give half of them to get the business, it is manifest that this would lead to practices that ought not to be encouraged, and would be a hardship on the tobacco raiser, which the statute was designed to prevent. Of course, the proof before us does not show such an extreme case as this. But the facts shown by the evidence do not present a case showing clearly and beyond all doubt such a flagrant attack upon the rights of property as to compel the court to say that the rate prescribed will necessarily have the effect to deny just compensation for private property taken for public use. The rates prescribed by the statute are higher than those prescribed by the act of February 6, 1860. which limited the entire charge to $3.25 a hogshead; and the constitutionality of that act was never assailed, so far as we are aware of. The exhibits filed with the ordinary actions show that when the suits were filed, and for some time before, appellees were in fact charging the seller, in many cases, $1.50 per hogshead for selling the tobacco, and the buyer an outage fee of $1.50, which would make their fees, under their own regulations, less, perhaps, than

the statute allows. It can not be presumed that they voluntarily cut down their charges below a fair price, for from the outset, by common consent, they ignored the statute, and fixed their rates by their own rules.

The last General Assembly passed the following act repealing the statute in question:

"(1) That an act entitled 'An act to regulate the sale of leaf tobacco in this Commonwealth, approved April 5, 1892, be and the same is hereby repealed.

"(2) That no penalty provided in said act shall hereafter be recoverable in any court of this Commonwealth."

This act became a law without the Governor's signature on March 29, 1902.

The statute in controversy having thus been repealed, the question arises, What are the rights of the parties? By section 465, Kentucky Statutes, no new law shall be construed to repeal a former law as to any act done, or any penalty incurred, or any right accrued under it. But what one Legislature provides, another may repeal; and the act of March 29, 1902, not only repeals the former statute under which these proceedings were instituted, but, in terms, provides that no penalty under that act shall hereafter be recovered in any court of the State. It is settled that, in order to enter judgment for a penalty, there must be a statute in force at the time authorizing the court to enter the judgment, and that if the act is repealed pending the action the court is without power to give judgment, and the action must be dismissed. Com. v. Cain, 77 Ky., 525; Speckert v. City of Louisville, 78 Ky., 287; Dinsmore v. Express Co., 183 U. S., 115, 22 Sup. Ct., 45. We are therefore without authority to proceed further in these actions, if the statute of March 29, 1902, is constitutional; for, though it does not take effect until 90 days

after adjournment of the legislative session at which it was passed, it will take effect before any judgment we may enter becomes final. Section 59 of the Constitution provides: "The General Assembly shall not pass local or special acts concerning any of the following subjects, or for any of the following purposes, namely: . . . To regulate the punishment of crimes and misdemeanors or to remit fines, penalties or forfeitures." It is insisted for appellants that the act, in so far as it prevents the courts from enforcing the penalties already incurred under the former statute, is in violation of this section. The right to repeal a statute is not affected by this provision of the Constitution. By the repeal of the statute, at common law, the right to enforce penalties under it was destroyed. This right is saved in ordinary cases by section 465, Kentucky Statutes; but this saving, being only matter of legislative authority, may be repealed by the Legislature, and in repealing statutes it may in each case determine to what extent the act repealed shall continue in force. By the act in question the Legislature undertook to take out of the operation of section 465 the repeal of the act in controversy, and we are unable to see that this is a violation of the constitutional provision; for, were the rule otherwise, it would result that the Legislature could not repeal any statute under which penalties had been incurred, and take away from the courts power to enforce the penalty. This would be to deny to the Legislature a power universally recognized. Such was not the intention of section 59 of the Constitution. It inhibits the Legislature from passing any local or special act to remit penalties; but it does not affect its power to repeal any existing statute, and give to the repeal its common-law effect of taking away from the courts power to enforce penalties incurred un-

der it.  The Legislature has all-power that is not expressly taken away from it.  In this it differs from the Congress of the United States, which has only such power as is conferred upon it.  The power to repeal a statute, and take away the authority to enforce penalties incurred under it, existed in the Legislature at the time of the adoption of the present Constitution, and not being clearly taken away, remains as before.  After the right to enforce the penalties has perished, the action to recover them can not be prosecuted further.

The judgment complained of is therefore reversed, and the cases are remanded, with directions to the circuit court to discharge the injunction and dismiss the equity action, with costs, and to strike the ordinary actions from the docket.

Whole court sitting.

(November 12, 1902.)

The mandate in these cases is modified so as to direct the circuit court to dismiss the ordinary actions without prejudice and without judgment for costs, all power to proceed further therein having been taken away by the Legislature.  This is what we meant when we directed the actions to be stricken from the docket.