TOWNSEND ET AL. *v.* YEOMANS, ATTORNEY GENERAL OF GEORGIA, ET AL.

No. 781. Argued May 3, 4, 1937.—Decided May 24, 1937.

*Messrs. Wm. Hart Sibley* and *Robert C. Alston,* with whom *Mr. E. K. Wilcox* was on the brief, for appellants.

*Messrs. O. H. Dukes,* Assistant Attorney General of Georgia, and *L. W. Branch,* with whom *Mr. M. J. Yeomans,* Attorney General, was on the brief, for appellees.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This suit was brought by tobacco warehousemen to restrain the enforcement of a statute of Georgia, approved March 28, 1935, fixing maximum charges for handling and selling leaf tobacco. Ga. L. 1935, pp. 476–8.

The statute was assailed as an arbitrary and capricious exercise of state power, repugnant to the Fourteenth Amendment of the Federal Constitution, and as placing a direct burden upon interstate commerce in violation of the commerce clause. The hearing in the District Court was by three judges (28 U. S. C. 380) and, upon findings of fact and conclusions of law, a final decree was entered dismissing the bill of complaint, one judge dissenting. The case comes here on appeal.

The facts found by the District Court with respect to the tobacco industry in Georgia and the nature of the transactions at the warehouses are not in dispute. It appears that this industry is relatively new, beginning in 1917, but by the year 1925 it was becoming well established. The type of tobacco grown in Georgia is the "bright leaf" which is almost exclusively used in the manufacture of cigarettes. This variety is grown extensively in North Carolina, to a much less extent in South Carolina and Georgia, and to some extent in Virginia, Kentucky and Tennessee. The acreage planted by the individual farmer in Georgia is comparatively small but the aggregate acreage is now not only very considerable but is widely distributed over a large area in the southern portion of the State.

The necessity for markets and the early maturity of the tobacco in Georgia presented an opportunity which

was early recognized by experienced and skilled warehousemen who were operating in the tobacco belts of North Carolina and other States, where selling seasons begin sometime after the termination of the selling season in Georgia. With few exceptions, competent warehousemen, and experienced and skilled auctioneers and helpers in handling and selling tobacco are not found in Georgia and must be obtained from other States. There were forty-five warehouses operated in 1935, thirty-nine of which were connected in some capacity with warehouses in North Carolina, Kentucky, Virginia or Tennessee.

The principal purchasers of the bright leaf tobacco grown in Georgia and elsewhere are limited to a few large manufacturers of cigarettes. These are called "the Companies." They purchase tobacco only at warehouse auction sales to which they send or furnish "buyers." Each buyer is the representative of one of the competing purchasers and a "set of buyers," usually from eight to twelve in number, is made up of representatives from each of the purchasing cigarette manufacturers. The presence of a "set of buyers" is essential at an auction sale. A town having one or more warehouses is known as a "market." By sending a set of buyers to a new warehouse, the manufacturers may recognize a new market, and by refusing to send one to an old market may cause its abandonment; and by sending either one or two sets of buyers to a given market the manufacturers may determine the rapidity with which the accumulated tobacco may be disposed of. There is another class of purchasers known as "speculators." These on rare occasions buy tobacco from a grower and have it transported to a warehouse for sale. At auction sales speculators to a limited extent, as compared with buyers, purchase tobacco for a later sale. There is strenuous and expensive competition between warehousemen in securing tobacco from growers to be

handled and sold, but in the sale of tobacco there is no competition except such as exists between the respective buyers and speculators at the auction sales, and the bids of the warehousemen themselves.

The tobacco belt in Georgia comprises about twenty counties in the southern part of the State, and in 1935 there were fifteen towns known as "markets." Seven of the markets were supplied with one set of buyers and eight were furnished two sets. The "two set markets" had a total of thirty and the "one set markets" a total of fifteen warehouses in operation. The quantity of tobacco sold in the warehouses and the average prices ranged from 106,483,019 pounds at 9.86 cents per pound in 1930, to 71,826,352 pounds at 18.91 cents per pound in 1935.

After the tobacco has been cured and is ready for the market, the grower grades it as best he can and the resulting "piles" of loose leaves are placed in sheets which are then tied and the tobacco is so transported to the selected warehouse for sale. Auction sales are held daily during five days of the week, and in any particular warehouse as often as sufficient tobacco accumulates. It is essential that there be present the warehouseman, an auctioneer and other skilled help, and one set of buyers. The warehouseman makes the opening bid. If this is not taken or raised by another, the warehouseman generally becomes the purchaser of the tobacco for his own account. If not sold in that fashion the bidding continues until the sale is announced. The grower or other owner may turn down the sale and in such case he may hold the tobacco for a later sale or remove it. After the sale has been completed the tobacco is delivered to the purchaser who removes it from the floor. The purchaser has it reweighed and pays the warehouseman. The warehouseman then pays the seller the purchase price, less warehouse charges. Tobacco purchased by the warehouseman is afterwards sold by him at auction.

The tobacco is ready for the market in the latter part of July or early in August. The exact date for opening the selling season is fixed by the manufacturers, who are the principal buyers, and the warehousemen. The selling season is from three to five weeks in length. The short tobacco season causes growers to rush tobacco to the market and does not give them a fair opportunity "to properly grade, store, bundle, and orderly market their tobacco." The short season is in large part occasioned by the efforts of the manufacturers to transfer their buyers to the North Carolina belts, in some of which the selling seasons begin early in September, and the efforts of the warehousemen to dispose of the tobacco in Georgia so that they and their auctioneers and other skilled employees may proceed to the later and larger seasons of North Carolina and other States.

When the Act in question was passed, the warehouse charges, based upon three elements, the sale value, the number of piles handled and the weight of the quantity sold, were as follows:

Commissions: 2½ per cent. on gross sales.

Auction fees: 25 cents per pile up to 200 pounds; 50 cents per pile above 200 pounds.

Weighing and handling fees: 25 cents per pile up to 100 pounds, and 25 cents for each additional 100 pounds.

The Act of 1935 prescribed the following maximum charges:

Commissions: 2½ per cent. on gross sales.

Auction fees: 15 cents on all piles of 100 pounds or less; 25 cents on all piles over 100 pounds.

Weighing and handling fees: 10 cents per pile of 100 pounds or less, and 10 cents for each additional 100 pounds.

It will be observed that the statutory reduction is confined to the auction fees and the charges for weighing and handling. The percentage reduction is difficult of

exact determination. Complainants say that the gross income of the warehousemen will be reduced about 20 per cent. The difference in dollars between the amount which complainants would have received in 1935 under the former schedule and the amount to which they would be entitled under the Act is found to be $115,920.90, and this amount was paid into the registry of the court. Statutes in North Carolina and South Carolina fix the same scale of charges as those prescribed by the Georgia Act. No attack has been made upon the constitutionality of these statutes. The scale heretofore in effect in Georgia "is not so high as the non-statutory Tennessee or Kentucky charges."

The District Court made additional findings, which appellants challenge, with respect to the control exercised by the warehousemen over the charges made for their services and their common agreement as to the amount of these charges. The court found that by reason of their control of the warehouses "warehousemen have, unless regulated by law, an unduly coercive control over the prices charged the growers for services"; that beginning with the tobacco selling season of 1927 all warehousemen in Georgia have uniformly maintained "a hard and fast schedule of charges"; that, while there have been some exceptions, they are "so insignificant as to be immaterial"; that prior to 1927 the warehousemen in Georgia for many years, if not from the beginning of the industry, "had maintained and exacted from sellers of tobacco a uniform schedule of charges substantially, if not identically, the same as the schedule fixed by the Act of 1935."

The court also found that the propriety of charging more for handling tobacco in Georgia than in the Carolinas had not been established; that it had not been shown that the Georgia Act "was passed without any knowledge on the part of the legislature as to actual con-

ditions under which the business was, and is, being carried on in Georgia"; that it had not been proved "what each or any warehouseman, individual or corporate, lost in revenue by reason of the scale of charges prescribed by the Act"; that it was not denied "that some warehousemen earned a satisfactory profit" and it had not been proved that where a loss occurred it was not due "to excessive competition, ill-advised loans, unnecessary expenses in buying influence or hauling customers' tobacco, or other causes than the reduction in charges." The court observed that the testimony as to the effects of the Act was with respect to the "group of warehousemen who are complainants, rather than to the effect on each one, and even then it was not proven that all the losses are traceable to the reduction in charges rather than to other causes."

The court made findings with regard to the organization known as the "Tobacco Warehousemen's Association" of which all the complainants were members. The court said that the prosecution of the suit was "an organized fight through the Warehousemen's Association"; that the growers are not eligible for membership in that organization; that "the Association and the buyers determine the date the market in Georgia opens and substantially determine the date on which it closes"; that the Association undertakes to deal with such practices as affect the interest of the members and adopts rules which they are to observe. The court quoted from the minutes of meetings certain action tending to support the view that there was a common agreement as to warehouse charges and a concert of action in relation to the present suit. The court concluded that "through the Warehousemen's Association and their common agreement" as to charges the complainants "maintain and enjoy a virtual monopoly in the field covered by their operations"; that the business of tobacco warehousemen in Georgia in 1935,

and for some years prior thereto, was such as to cause it to be "affected with a public interest"; that the scale of charges prescribed by the Act was "not unreasonable, arbitrary, and capricious" but was "reasonably adapted to accomplish the desired result"; and that the fixing of charges for the services rendered by the warehousemen did "not burden or interfere with interstate commerce."

*First.* Unless there is conflict with the authority of the Congress over interstate commerce, the enactment of the statute was clearly within the competency of the Georgia legislature. While appellants' assignment of errors challenge the conclusion of the District Court that the business of the tobacco warehouses was one "affected with a public interest," their counsel conceded in the argument at bar that the challenge could not be sustained. That concession was appropriate in view of the evidence and the findings. The uncontroverted facts with respect to the nature and extent of the tobacco industry, the establishment of markets for public sales, and the dependence of the industry upon the services of the warehousemen in connection with these sales, show beyond cavil the public interest in these markets and in the maintenance of reasonable charges for the services there rendered.

A similar conception of public interest, reënforced by abundant experience, is reflected in the legislation of other tobacco growing States. In Virginia the sale of tobacco in public warehouses has long been regulated by statute and maximum charges have been fixed. Code of Virginia, 1887, §§ 1819–1825; 1924, §§ 1376–1381. In North Carolina such regulation goes back to an early day. See Consolidated Statutes of North Carolina, §§ 5124 *et seq.* In *Gray* v. *Central Warehouse Co.,* 181 N. C. 166; 106 S. E. 657, the Supreme Court of that State, after summarizing the local legislation upon that subject since 1895, goes on to say:

"Indeed, as far back as the history of the state extends, the business of tobacco warehouses has been, if not a public duty, always 'affected with a public use.' The laws of North Carolina from 1669 to 1790 have been compiled as State Records, vols. 23, 24 and 25, by the writer of this opinion [Chief Justice Clark], and in the index thereto, in the last named volume, it appears that no less than 75 statutes were enacted prior to 1790 in regard to tobacco warehouses requiring inspection, regulation, and fixing charges in such business. To the fullest extent, therefore, their regulation and control by the public has been recognized and enforced in this State.—In fact, there is no subject in which the protection of the producers against extortion and combinations to reduce prices is more important."

In South Carolina maximum charges for selling leaf tobacco upon the floor of tobacco warehouses are fixed. Code, South Carolina, 1932, § 7197, and earlier statutes there cited. The statute of Georgia, here under attack, copies almost exactly the South Carolina statute. See, also, as to the authority of the State, *Nash* v. *Page,* 80 Ky. 539; *Pannell* v. *Louisville Tobacco Warehouse Co.,* 113 Ky. 630.

So far as the present controversy turns upon the power of the State to give this sort of protection to this industry, provided its regulation is not arbitrary or confiscatory and in the absence of conflict with the federal power over commerce, our rulings are decisive in support of the state action. *Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143 U. S. 517; *Brass* v. *Stoeser,* 153 U. S. 391; *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389; *O'Gorman & Young* v. *Hartford Insurance Co.,* 282 U. S. 251; *Nebbia* v. *New York,* 291 U. S. 502.

Confiscation is not shown. The presumption of reasonableness has not been overthrown. *O'Gorman & Young* v. *Hartford Insurance Co., supra.* It is apparent

that the return to the warehousemen will largely be governed by the volume and value of the tobacco crop. The evidence relates chiefly to the years of the great depression and affords no appropriate criterion for a more normal period. Moreover, we find no sufficient ground for disturbing the finding of the District Court that the evidence did not satisfactorily establish what any warehouseman, individual or corporate, lost by reason of the prescribed scale of charge in contradistinction to its effect upon the warehousemen as a group. See *Aetna Insurance Co.* v. *Hyde*, 275 U. S. 440, 447, 448. The burden resting upon appellants to make a convincing showing that the statutory rates would operate so severely as to deprive them, respectively, of their property without due process of law, was not sustained. *Aetna Insurance Co.* v. *Hyde, supra; Los Angeles Gas & Electric Corp.* v. *Railroad Commission*, 289 U. S. 287, 304, 305; *Lindheimer* v. *Illinois Bell Telephone Co.*, 292 U. S. 151, 164; *Dayton Power & Light Co.* v. *Public Utilities Comm'n*, 292 U. S. 290, 298.

Appellants contend that the legislative action was taken without investigation and hence must be considered to be arbitrary and beyond the legislative power. There is no principle of constitutional law which nullifies action taken by a legislature, otherwise competent, in the absence of a special investigation. The result of particular legislative inquiries through commissions or otherwise may be most helpful in portraying the exigencies to which the legislative action has been addressed and in fortifying conclusions as to reasonableness. *Nebbia* v. *New York, supra*, pp. 516 *et seq.* But the legislature, acting within its sphere, is presumed to know the needs of the people of the State. Whether or not special inquiries should be made is a matter for the legislative discretion. Here, the existence of the industry, highly important to the State, the transactions in the tobacco markets, the

necessity of protecting the growers from exorbitant warehouse charges, must be presumed to have been fully known to the members of the legislature and this presumption cannot be overthrown, as it has been sought to be overthrown, by testimony of individual legislators.

*Second.* The main contention of appellants is that the State had no power to enact the regulation as it attempted to govern transactions in the course of interstate and foreign commerce. Appellants urge that practically all the tobacco grown in Georgia is shipped out of the State, about forty per cent. in foreign, and the remaining sixty per cent. in interstate, commerce; that the purchasers at the "markets" in Georgia for the most part are manufacturers of cigarettes who immediately have the tobacco transported to their plants outside the State; that the purchases made by speculators and warehousemen are for the purpose of resale as soon as possible to the cigarette manufacturers, and thus that the tobacco so bought, as well as the rest, "is destined for interstate or foreign shipment."

We find it unnecessary to pass upon the authority of the Congress to regulate the charges of the warehousemen, for we are of the opinion that, if it be assumed that Congress has that authority, it has not been exercised and in the absence of such exercise the State may impose the regulation in question for the protection of its people.

The federal statute, to which appellants refer, is the "Tobacco Inspection Act" of August 23, 1935. 49 Stat. 731. That statute, while declaring the transactions in tobacco at auction markets to be "affected with a public interest" (§ 2) had a limited objective. It did not undertake to regulate the charges of warehousemen or in any way to derogate from the existing state legislation upon that subject. It sought to aid tobacco growers by establishing and promoting the use of standards of classification and by maintaining an official inspection service.

It was found that the farmer had "no definite system of grades of his own," that the private grading systems used by the buyers were kept "strictly confidential" so that "without Government standards the farmer has no definite guide for sorting his tobacco," and that hence "farmers generally are unable to class their tobacco correctly to meet the trade's demands." [1]  To meet this need, the Act authorized the Secretary of Agriculture to make investigations and to establish standards for tobacco "by which its type, grade, size, condition, or other characteristics" might be determined (§ 3). It authorized the Secretary to designate auction markets, on determining "by referendum the desire of tobacco growers," but it was also provided that the Act should not be construed as preventing transactions in tobacco at markets not so designated (§ 5). It authorized the Secretary, independently or in coöperation with other branches of the Government, State agencies, or others, to employ and license competent persons as samplers or weighers but it was added that this provision was "intended merely to provide for the furnishing of services upon request of the owner or other person financially interested in tobacco to be sampled, inspected, or weighed," and should "not be construed otherwise" (§ 6). And the Secretary was further authorized, in order to carry out the purposes of the Act, to "coöperate with any other Department or agency of the Government; any State, territory, district or possession," as well as with purchasing and consuming organizations, boards of trade, etc. (§ 14).

The Congress, as the reports of the committees in both Houses show,[2] was fully conversant with the manner in which the transactions in tobacco were carried on.  It

---

[1] See Report of the House Committee on Agriculture, H. R. Rep. No. 1102, 74th Cong., 1st sess.; Report of Senate Committee on Agriculture and Forestry, Sen. Rep. No. 1211, 74th Cong., 1st sess.

[2] See Note 1.

cannot be doubted that the Congress was well aware of the long-established legislation in Virginia, North Carolina, South Carolina, and the more recent legislation in Georgia, prescribing maximum charges for the services of warehousemen. We deem it to be highly significant that, in the light of existing practices and statutory regulations, the Congress carefully restricted its own requirements and did not attempt to interfere with the operation of state laws as to the amounts which warehousemen might charge. The purpose and terms of the federal statute negative any such intention. It is inconceivable that the Congress in endeavoring to aid the tobacco growers in sorting or "grading," and thus to facilitate the marketing of their tobacco, intended to deprive them of the protection they already had against extortionate charges of the warehousemen upon whom they depended in making their sales. Instead of frustrating the operation of such state laws, the provisions of the Act expressly afforded and emphasized the opportunity for coöperation with the States in protecting the farmers' interests. In this view we find no ground for the contention that Congress has taken possession of the field of regulation to the exclusion of state laws which do not conflict with its own requirements.

The case calls for the application of the well-established principle that Congress may circumscribe its regulation and occupy a limited field, and that the intent to supersede the exercise by the State of its police power as to matters not covered by the federal legislation is not to be implied unless the latter fairly interpreted is in actual conflict with the state law. *Savage* v. *Jones,* 225 U. S. 501, 533; *Atlantic Coast Line* v. *Georgia,* 234 U. S. 280, 293, 294; *Illinois Central R. Co.* v. *Public Utilities Comm'n,* 245 U. S. 493, 510; *Carey* v. *South Dakota,* 250 U. S. 118, 122; *Lehigh Valley R. Co.* v. *Public Utilities Comm'n,* 278 U. S. 24, 35; *Atchison, T. & S. F. Ry. Co.* v.

*Railroad Comm'rs,* 283 U. S. 380, 392, 393; *Hartford Indemnity Co.* v. *Illinois,* 298 U. S. 155, 158.

Laying on one side the federal statute, as in no way inconsistent, we find no ground for concluding that the state requirements lay any *actual* burden upon interstate or foreign commerce. The Georgia Act does not attempt to fix the prices at the auction sales or to regulate the activities of the purchasers. The fixing of reasonable maximum charges for the services of the warehousemen in aid of the tobacco growers does not militate against any interest of those who buy. They pay the bid price, as accepted, and the warehouseman pays the seller, deducting from the purchase price the warehouse charges.

We are thus brought to the final contention of appellants that the state law, although not in conflict with any exertion of federal authority, must fall as being repugnant to the existence of an exclusive federal power although unexercised. The contention ignores the principle that this ground of invalidity is to be found only with respect to such matters as demand a general system or uniformity of regulation; that in other matters, admitting of diversity of treatment according to the special requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act. *Cooley* v. *Board of Wardens,* 12 How. 299, 319; *Minnesota Rate Cases,* 230 U. S. 352, 399, 400; *Hendrick* v. *Maryland,* 235 U. S. 610, 622; *Morris* v. *Duby,* 274 U. S. 135, 143; *Sproles* v. *Binford,* 286 U. S. 374, 390.

In the instant case, the Georgia statute deals with a local need, exercising the State's protective power with respect to its own industry. A similar contention to that now advanced was held untenable in *Munn* v. *Illinois,* 94 U. S. 113, where state regulation of charges by the proprietors of grain elevators was sustained despite the fact that the elevators were used as instrumentalities by those

who engaged in interstate commerce. *Id.,* p. 135. The point was again raised and overruled in *Budd* v. *New York,* 143 U. S. 517, in upholding the New York statute regulating charges for "elevating, trimming, receiving, weighing and discharging grain by means of floating and stationary elevators and warehouses." It was recognized that, in the actual state of the business, the passage of the grain to the City of New York and other places on the seaboard without the use of elevators would be practically impossible. The elevator at Buffalo was a link in the chain of transportation of the grain from the places where it was grown to the seaboard, but the Court said: "So far as the statute in question is a regulation of commerce, it is a regulation of commerce only on the waters of the State of New York. It operates only within the limits of that State, and is no more obnoxious as a regulation of interstate commerce than was the statute of Illinois in respect to warehouses, in *Munn* v. *Illinois.* It is of the same character with navigation laws in respect to navigation within the State, and laws regulating wharfage rates within the State, and other kindred laws." *Id.,* pp. 544, 545. Again, in *Brass* v. *North Dakota,* 153 U. S. 391, the statute of that State "regulating grain warehouses and weighing and handling of grain" was held not to amount to a regulation of commerce between the States in the absence of a conflict with federal legislation, upon the authority of the *Munn* and *Budd* cases.

In *Cargill Co.* v. *Minnesota,* 180 U. S. 452, 470, the requirement of a state license for grain warehouses on railroad rights of way was found to be not inconsistent with the power of the Congress, although the warehouse company purchased the grain, handled in or shipped from its warehouse, for the purpose of transporting it as its property to its terminal elevators in Wisconsin and Illinois and thence to other points in the eastern States. *Id.,* p.

462. The Court thus stated the reasons for this conclusion: "The statute puts no obstacle in the way of the purchase by the defendant company of grain in the State or the shipment out of the State of such grain as it purchased. The license has reference only to the business of the defendant at its elevator and warehouse. The statute only requires a license in respect of business conducted at an established warehouse in the State between the defendant and the sellers of grain. . . . In no real or substantial sense is such commerce obstructed by the requirement of a license." See, also, *Merchants Exchange* v. *Missouri,* 248 U. S. 365, 368.

Even where the Federal Government has intervened, as in the United States Warehousing Act of August 11, 1916, 7 U. S. C., c. 10, in providing for licenses for warehouses where agricultural products are "stored for interstate or foreign commerce," we held that the license did not convert the warehouseman into an instrumentality of the Federal Government and, while by means of the licensing provisions a measure of control over those engaged in the business was secured to the national government, still the license did not confer upon the warehouseman immunity from state taxation. *Federal Compress Co.* v. *McLean,* 291 U. S. 17, 22, 23. That case was followed by our decision in *Chassaniol* v. *Greenwood,* 291 U. S. 584, to the effect that the business of buying and selling cotton locally produced, processed and warehoused, was local in character, and that a local occupation tax upon the buyer did not contravene the commerce clause although the course of the business was such that all the cotton so bought was ultimately shipped by the buyer in interstate or foreign commerce. On similar grounds we held in *Minnesota* v. *Blasius,* 290 U. S. 1, 8, that because there was "a flow of interstate commerce" which was subject to the regulating power of the Congress, it did not necessarily follow that, in the absence of a con-

flict with the exercise of that power, a State might not lay a non-discriminatory tax upon property which "although connected with that flow as a general course of business" had come to rest and acquired a situs within the State.

All these decisions but illustrate the principle that the mere existence of the congressional power, no conflict with its exercise being shown, does not deprive the States of their authority to safeguard their local interests by legislation which does not directly burden transactions in interstate or foreign commerce.

The cases upon which appellants rely are distinguishable. In *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, the statute held to be invalid imposed burdensome conditions upon the enforcement of rights arising from transactions in interstate commerce. In *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50, the North Dakota statute of 1919 disclosed a comprehensive scheme to regulate the buying of grain in the course of interstate commerce. Such purchases could be made only by those who held licenses from the State, paid state charges for the same, and acted under a system of grading, inspecting and weighing fully defined in the Act. The grain could only be purchased subject to the power of the state grain inspector to determine the margin of profit which the buyer could realize upon his purchase. That margin of profit was defined to be the difference between the price paid at the North Dakota elevator and the market price, with an allowance for freight, at the Minnesota points to which the grain was shipped and sold. The state officer was thus authorized to "fix and determine the price" to be paid for grain which was "bought, shipped, and sold in interstate commerce." That the provision was a regulation of interstate commerce was said to be "obvious from its mere statement." *Id.,* pp. 56–58. The later North Dakota statute of 1923 fell under a like condemnation in

*Shafer* v. *Farmers Grain Co.*, 268 U. S. 189, as the statute subjected the buying for interstate shipment to conditions and a measure of control which caused a direct interference with interstate commerce.

Here, the Georgia Act lays no constraint upon purchases in interstate commerce, does not attempt to fix the prices or conditions of purchases, or the profit of the purchasers. It simply seeks to protect the tobacco growers from unreasonable charges of the warehousemen for their services to the growers in handling and selling the tobacco for their account. Whatever relation these transactions had to interstate and foreign commerce, the effect is merely incidental and imposes no direct burden upon that commerce. The State is entitled to afford its industry this measure of protection until its requirement is superseded by valid federal regulation. The judgment of the District Court is

*Affirmed.*