Doyle Conner Commissioner of Agriculture Tallahassee
QUESTION:
Are certain provisions of the Florida Statutes relating to livestock sales, ss. 534.47-534.54, preempted by the amended Federal Packers and Stockyards Act (and regulations promulgated thereunder) and, therefore, unenforceable?
SUMMARY:
Subject to a judicial determination to the contrary, the provisions of Florida law relating to livestock sales are not necessarily in irreconcilable conflict with federal law such that they are preempted thereby. However, there are various provisions that could reasonably be seen by a court to conflict, and I am accordingly recommending that you seek legislative changes in Florida law in order that it more strictly accord with federal law.
Your request arises from the following factual situation. Sections534.47-534.53, F. S. 1977, impose several duties and responsibilities upon `livestock markets' (defined by s. 534.47(2) as any location in Florida where livestock is `assembled and sold at public auction or on a consumption basis during regularly scheduled or special sales') and upon the Department of Agriculture (hereinafter `department'). The markets must annually secure a license from the department prior to engaging in business. Section 534.48. The statute requires that livestock markets collect for livestock sold through the market to dealers, order buyers, packers, producers, and farmers on the date of sale (or date of delivery in some cases) and deposit the proceeds into their custodial accounts no later than the next banking day following the date of sale. Collection may be made only in the form of cash, check, or draft. Section 534.49. A livestock market is required to report to the department within 24 hours after having knowledge that a check or draft issued to pay for livestock has been dishonored. The department in turn shall notify all licensed livestock markets in the state of such dishonor. Section534.50.
The penalties for violation of these requirements by a livestock market are a prohibition from filing a complaint under s. 604.21
(bond requirement for licensed agriculture dealers) in connection with the transaction involved, suspension, revocation, or a refusal to renew the license to operate, or a fine. Section534.51. Violation of the collection (but not reporting) requirements may also subject the livestock market to a second degree misdemeanor prosecution. Such penalty may also be imposed upon a purchaser who delays payment of a livestock draft at the payor's bank. Sections 534.501 and 534.52.
Section 534.49, F. S., further provides that, for the purposes of that section, livestock drafts given as payment at livestock auction markets for livestock purchases shall not be deemed an express extension of credit to the buyer and shall not defeat the creation of a lien, as provided in s. 534.54(4), F. S., on such an animal and its carcass or products derived therefrom, and proceeds thereof, to secure all or part of its sales price. Section 534.49, as amended by Ch. 77-362, Laws of Florida. See also s. 534.54(4), providing that any person, partnership, firm, corporation, or other organization which sells livestock (defined by s.534.54[1][a] to mean cattle or hogs) shall have a lien on any such animal, the carcass thereof, all products therefrom, and the proceeds thereof to secure all or a part of such animal's sales price without regard to the possession thereof by the party entitled to such lien upon the delivery of such animal to the purchaser and without further perfection of such lien. If any such animal or its carcass or products therefrom is so commingled with other livestock, carcasses, or products so that the identity thereof is lost, then such lien extends to the same effect as if it had been perfected originally in all such animals, carcasses, and products with which it has become commingled, and all such extended liens shall be on a parity with one another. However, such extended liens on commingled carcasses or products shall not be enforceable as against any purchaser without actual knowledge thereof purchasing one or more of such carcasses or products in the ordinary course of trade or business from the party having commingled such carcasses or products or against any subsequent transferee from such purchaser, but in the event of such sale, such lien shall instead extend to the proceeds of such sale.
Section 534.54(2)(a) provides that except as otherwise provided with respect to livestock markets pursuant to s. 534.49, F. S., a meat processor (one who is in the business of slaughtering cattle or hogs) who purchases livestock from a seller, or any person or legal entity who purchases livestock from a seller for slaughter, shall make payment by cash or check for the purchase price of the livestock and actually deliver the cash or check to the seller at the location where the purchaser takes physical possession of the livestock on the day the transfer of possession occurs or by wire transfer of funds on that business day on which the possession of the livestock is transferred, or if transfer of possession occurs after normal banking hours, such payments shall be made not later than the close of the first business day following such transfer of possession. In the case of `grade and yield' selling, the purchaser shall make payment by wire transfer of funds or personal or cashier's check by registered mail postmarked not later than the close of the first business day following determination of `grade and yield.' It should be noted that this section, in contrast to ss. 534.47-534.53, applies only to cattle and hogs, imposes the affirmative duties upon the purchaser rather than upon the seller, and contains no penalties for enforcement by the department.
It can be seen that the Florida statutes in question impose duties for collection and enforcement upon livestock markets. The department's sole duties in this regard concern notification to other markets of a dishonored check or draft and issuance and revocation of licenses and imposition of fines in the event of violation of the statutes by a market. Your responsibilities under the statute appear, therefore, to be very limited and your question does not ultimately seek to determine what your own responsibilities are under the statute since the limited duties placed upon the department do not seem to be in question. While I must normally restrict my reply to opinion requests received from public officials to only those matters which concern their official duties, I trust the following discussion will prove helpful.
In 1976 the Federal Packers and Stockyards Act of 1921 (hereinafter `act') was amended by Congress and regulations were promulgated thereunder in 1977. The amended act and its implementing rules and regulations concern, inter alia, certain requirements for the sale of and payment for livestock. Section 409(a) of the act requires that a packer, market agency, or dealer purchasing livestock shall pay the seller or his agent the full amount of the purchase price (which payment shall be by check or by wire if the purchase is for slaughter) before the close of the next business day after the purchase of livestock and the transfer of possession thereof. If the seller or his agent is not present at the point of transfer of possession to receive the check, payment may be made by wire or by mail if posted within the required time limit. Section 409(b) states that subject to such terms and conditions as the United States Secretary of Agriculture may prescribe, the parties to the purchase and sale of livestock may expressly agree in writing before the purchase or sale to effect payment in a manner other than that required in s. 409(a) of the act. See ss. 201.43(b)(1) and (2)(i), (ii) and 201.200(a) and (b), regulations. The regulations allow payment to be made by a draft other than a check if written agreement therefor is obtained from the seller before the transaction. If, however, the purchaser is a packer (or one acting on a packer's behalf) who annually purchases more than $500,000 in livestock, the seller must sign a prescribed acknowledgment and such purchase method is deemed to be purchasing on credit. Sections 201.43(b)(1) and 201.200(a) and (b), regulations. The acknowledgment required before such a credit purchase may be made states that the seller relinquishes his rights under the trust provisions of s. 206 of the act. That section provides that an obstruction to interstate commerce is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on livestock purchased by packers in cash sales or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom when payment is not made for the livestock. In order to remedy this obstruction of commerce, Congress created in s. 206(b) a trust provision under which all livestock, and all inventories of or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, purchased in cash sales (defined as a sale wherein the seller does not expressly extend credit to the buyer, s. 206[c]) by a packer who annually purchases more than $500,000 in livestock shall be held by the packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by all of them.
The federal act in question was enacted pursuant to Congress' power to regulate interstate commerce under the Commerce Clause of the United States Constitution. In general, it may be stated that interstate commerce is a proper and exclusive province of the federal government. The early case of Cooley v. Board of Wardens,53 U.S. 299 (1851), established the rule that, as to those subjects of commerce which necessarily demand a `single uniform rule' throughout the United States, Congress' power is exclusive. It is also clear that, regarding activities exclusively in interstate commerce, a state is without power to enact legislation which either directly or by necessary operation burdens or obstructs the free flow of interstate commerce, regardless of its purpose. Huron Portland Cement Co. v. Detroit, 362 U.S. 440
(1960); Edwards v. California, 314 U.S. 160 (1941). Nevertheless, the states are not foreclosed by the Commerce Clause from ever exercising their police power in a way that might affect interstate commerce. The United States Supreme Court has held that state regulation based on the police power which does not discriminate against interstate commerce or disrupt its required uniformity may constitutionally stand. As stated by the Supreme Court:
 The Constitution, when conferring upon Congress the regulation of commerce, never intended to cut the states off from legislating on all subjects relating to the health, life, and safety of their citizens, although the legislature may indirectly affect the commerce of the country; legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution. [Head v. New Mexico Board of Examiners in Optometry, 374 U.S. 424 (1963).]
See also Boston and Maine Railroad v. Armburg, 285 U.S. 234
(1932), and Gibbons v. Ogden, 22 U.S. 1 (1924). Therefore, there are clearly areas in which the power to regulate commerce exists concurrently in the federal and state governments. The general rule appears to be that state statutes are valid, even though they may affect interstate commerce, so long as they act evenhandedly and in a nondiscriminatory fashion to effectuate a legitimate local interest in the health, safety, morals, and welfare of the public, and so long as the effects on interstate commerce are only incidental and not disruptive of required national uniformity. See
Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). However, a state's actions are always and necessarily subject to the exercise by Congress of its authority to control such matters insofar as may be required for enabling it to discharge its constitutional function. Pacific Tel. Tel. Co. v. Tax Commissioner of Washington, 297 U.S. 403 (1936); Minnesota Rate Cases,230 U.S. 352 (1913). Therefore, it is clear that exclusive federal power may exist even in situations where, in the absence of federal regulation, the state may themselves legislate.
While federal and state laws should always, to the extent reasonably possible, be interpreted in such a way as to avoid conflict in their application, the Supremacy Clause demands, where such conflict is unavoidable through reasonable interpretation, that federal law stand supreme. Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963); Atchison, T. S.R.F. Co. v. Railroad Comm., 283 U.S. 380 (1930); Townsend v. Yeomans,301 U.S. 441 (1937).
Based upon these rules of preemption, your inquiry asks in essence for a determination as to whether there is an absolute and irreconcilable conflict between the state and federal regulation of the subject matter involved. I find no irreconcilable conflict here. However, I must emphasize several points. First, I do not posses the authority to recommend that a Florida statute be discregarded. Only a court of competent jurisdiction, in a case properly before it, would be authorized to make such a determination. Second, while I am of the opinion that there is no absolute or irreconcilable conflict in this instance, my conclusion is rendered without the benefit of judicial interpretation and is always subject to a contrary ruling by a court of competent jurisdiction. As a caveat, I would note that the question is extremely close; and a court could, in my opinion, reasonably interpret these provisions as being in conflict and rule that the state statutes are preempted.
You ask initially whether s. 534.49, F. S., is unenforceable in view of s. 409 of the federal act and ss. 201.43(b)(2)(i) and (ii) of the regulations. It must be remembered that s. 534.49 acts upon `livestock markets' and not upon those who purchase the livestock. The federal prompt payment requirements, on the other hand, operate upon certain purchasers of livestock but not upon sellers. Hence, in this regard, federal law imposes requirements under which these purchasers must make payment while state law provides the methods by which certain sellers must receive the payment. The only situation wherein the possibility of irreconcilable conflict between s. 409 of the federal act and s. 534.49, F. S., might exist is when the purchaser is within the definition of those subject to s. 409 and the seller is a `livestock market' and, even then, it seems to me that conflict would only exist if the methods of payment available to the packer by federal law were mutually exclusive of the methods for receipt of payment available to the market under state law.
While the provisions are not entirely complementary, as can be seen from the discussion above, if the purchaser complies with federal law as set forth in s. 409, he will make his payment in a manner by which it is permissible for the market to accept the payment under state law. The regulations, however, also permit the purchaser to pay by mail, while the market is not permitted by state law to accept such payment (or to agree in writing to accept such payment pursuant to s. 201.43[2][ii]). While this may ineffect foreclose the purchaser from using the mails to make payment, the Florida statute does not operate directly upon the purchaser, nor does it exclude the other methods of payment permissible by federal law. Therefore, since state law is preempted by federal law only in the event of an irreconcilable conflict, and since such conflict does not appear to be present here, I find, subject of course to a judicial determination to the contrary, that the state statute may be given effect.
You next ask whether ss. 201.43(b)(1) and 201.200(b) of the regulations preempt s. 534.49, F. S. You state in your letter of inquiry that ss. 201.43(b)(1) and 201.200(b) of the regulations `view the use of drafts given in payment of livestock as an extension of credit while Florida Statutes, Section 534.49
provides that such drafts shall not be deemed an express extension of credit.' I should first note that the sections of the regulations to which you cite refer only to packers whose annual purchases of livestock exceed $500,000, i.e., those purchasers who are bound by the trust provisions of s. 206 of the federal act. Payment with a draft other than a check when the purchaser is other than such a packer is not within this credit provision. Section 201.43(b)(1), regulations, states that the packer may not purchase by payment with a draft not a check without the seller's express agreement to the arrangement. Section 201.200(b) states that such arrangement constitutes a buying on credit, which in turn means that the seller's acknowledgment prescribed by s. 201.200(a)(1) must be signed, whereby the seller waives all his rights under the federal act including the s. 206 trust provision and expressly states that he has agreed to a sale on credit. Hence, a credit sale is not `deemed' by federal law to have occurred and is forbidden unless the seller expressly agrees to it. Florida law does not prohibit the seller from entering into an extension of credit arrangement; it simply states that payment by a draft other than a check will not be `deemed' per se an extension of credit. Further, it appears that the only effect of extending credit under the regulations is that the seller relinquishes all his rights under federal law respecting that sale. Hence, there are no federal remedies applicable which might conflict with state law. Therefore, s. 534.49 applies; the proceeds from the draft must be placed in the livestock market custodial account no later than the next business day following the date of sale, and under s. 534.501, F. S., the purchaser may not delay payment (quaere whether there actually exists a difference under Florida law between a draft and a check under these conditions), and the seller may take advantage of the lien provided in s. 534.54(4).
You also ask whether the provision of s. 534.49 that payment for livestock by draft shall not defeat creation of the lien provided in s. 534.54(4) is preempted by s. 206 of the federal act. I find that it is not. Section 206, as noted above, is a congressional response to its finding that a burden on interstate commerce is `caused by financing arrangements under which packers . . . placeliens on livestock purchased by packers in cash sales . . . .' (Emphasis supplied.) The lien provided in s. 534.54(4), F. S., is not a lien placed upon the livestock or livestock products by thepacker. It is a statutory lien which requires no action on the seller's part to perfect it. Furthermore, I see no practical difference between the s. 206 `trust' and the s. 534.54(4) `lien.' The federal provisions give sellers the right to collect againstall livestock and all receivables and proceeds, etc., purchased by the packer in cash sales until they are all paid off. The statutory lien does precisely the same thing. (While the federal trust provision applies only to `cash sales' as defined, noncash sales may only be accomplished by a relinquishment of federal rights under the act, hence vitiating even the possibility of conflict between the state and federal statutes.)
Finally, you ask whether s. 534.54(2)(a), concerning the method of payment by a slaughterer of cattle or hogs to any seller other than a livestock market for purchase of such livestock, is preempted by s. 409 of the act and by s. 201.43(b)(2)(ii) of the regulations. In conformity with my answer to your first question, it appears that a packer may comply with s. 409 without violating state law in any way. The regulations, however, authorize payment by mail, which is not permissible under state law. It appears from the policy statement by the United States Department of Agriculture that the amendments to regulations, including s. 201.43(b)(2)(ii), were adopted solely to clarify s. 409 of the act and to `suggest ways in which a seller may have a check mailed to him in payment for livestock . . . .' (Emphasis supplied.) Statement, Dept. of Agr. Reg. ss. 201.43-201.200,42 Fed. Reg. p. 49928 (Sept. 28, 1977). The state statute, clearly enacted for the seller's benefit, imposes no penalties upon a purchaser not in conformity with it other than liability to the seller for interest, 12 percent damages on the purchase amount, and a reasonable attorney's fee if the provision is breached. It is certainly questionable whether a purchaser would be held liable by a court for these amounts if he made a good-faith effort to comply with the state law and the seller was not available to receive money, or if the seller expressly agreed to accept payment by mail. In any event, however, s. 534.54 involves solely the rights of the parties to the purchase. Hence, the question must be properly adjudicated by a federal or state court of competent jurisdiction in an action properly brought by one of the parties to the purchase.
In sum, I reiterate that I am not authorized in any circumstance to recommend that a Florida statute be disregarded as invalid. Only a court may make such a determination. However, I see nothing in the federal and state statutes in question which is necessarily in irreconcilable conflict and which will not admit in any way of resolution or of consistent construction. Admittedly, it is a close question and there is no doubt a reasonable possibility that a court of competent jurisdiction, when presented with the proper factual situation, would find that the state statutes are preempted by federal law. Consequently, I recommend that you seek legislative change in Florida law in order that it be made to conform more closely with the federal act and regulations.
Prepared by: Frank A. Vickory, Assistant Attorney General