CITY OF TRENTON, PROSECUTOR, v. STATE BOARD OF
TAX APPEALS AND RIDER COLLEGE, RESPONDENTS.

Argued May 7, 1941—Decided August 26, 1941.

Before Justice BODINE, PERSKIE and PORTER.

For the prosecutor, *Louis Josephson.*

For the respondent Rider College, *William J. Egan* (*Robert
L. Hood,* of counsel).

The opinion of the court was delivered by

PERSKIE, J. The question requiring decision on the facts
of this case is whether the State Board of Tax Appeals, erred,
as claimed, in holding that the real and personal property of
Rider College were exempt from taxation for the year of 1940.

The local assessors of the City of Trenton, New Jersey,
assessed the real and personal property of Rider College,
located at Trenton, for the year 1940 as follows: "Lands and
Improvements, $184,375; Pers. $10,400; Total $194,775."
Rider College appealed to the Mercer County Board of Taxa-
tion on the ground that it was established and operated as a
fundamentally charitable and philanthropic institution and
not for profit, and, therefore, its real and personal property

in question were exempt from taxation. *N. J. S. A.* 54:4-3.6. That appeal was dismissed and the local assessment was sustained. On further appeal to the State Board of Tax Appeals that Board sustained the claimed exemption, reversed the judgment of the Mercer County Board of Taxation, and ordered the assessment canceled. To review the propriety of the judgment of the State Board of Tax Appeals, a Justice of this Court, on the application of the City of Trenton, allowed a writ of *certiorari.*

The applicable legal principles present no difficulty. The right to the claimed statutory exemption depends entirely upon the facts and circumstances of each particular case. *Dana College* v. *State Board of Tax Appeals,* 14 *N. J. Mis. R.* 308, 310; 184 *Atl. Rep.* 412; *affirmed,* 117 *N. J. L.* 530; 189 *Atl. Rep.* 620. Since statutes granting exemption from taxation are in the nature of a "renunciation of sovereignty," and are at war with the sound basic principle that the "burden of taxation ought to fall equally upon all," they are most "strongly construed" against those claiming exemption. Thus the facts and circumstances in each case must clearly and convincingly establish the right to exemption within the statute granting exemption, otherwise the general rule is invoked which subjects "all property to a just share of the public burdens." *Princeton Country Day School* v. *State Board, &c.,* 113 *N. J. L.* 515, 517; 175 *Atl. Rep.* 136; *Carteret Academy* v. *State Board of Taxes and Assessment,* 102 *N. J. L.* 525; 133 *Atl. Rep.* 886; *affirmed,* 104 *N. J. L.* 165; 138 *Atl. Rep.* 919. Otherwise stated, the proofs must be "free from fair doubt." *Carteret Academy* v. *State Board, &c., supra* (at *p.* 529). The burden of proof is upon the claimant to establish the asserted right to exemption. *Dwight School of Englewood* v. *State Board of Tax Appeals,* 114 *N. J. L.* 594, 599; 177 *Atl. Rep.* 175; *affirmed,* 117 *N. J. L.* 113; 187 *Atl. Rep.* 36.

The application of the stated principles to the facts and circumstances of each case is, as here, not free from difficulty.

Solely in aid of our determination of respondent's claim to exemption as of October 1st, 1939, let us examine the proofs, from the day respondent was established and there-

after operated, to ascertain whether they properly sustain respondent's claim that it was established and operated as a fundamentally charitable or philanthropic institution not for profit.

Respondent, Rider College, is an institution located at Trenton, New Jersey. It specializes in the instruction of general business subjects. Its high standing is conceded. It was established in 1865 by Anderson J. Rider. It was incorporated as an institution of learning, under the name of "The Rider Business College," on June 15th, 1897 (its "bulletin" gives this date as 1893), pursuant to the then existing act "for the incorporation of associations for the erection and maintenance of schools and institutions for educational purposes." *Pamph. L.* 1890, *ch. CCXXXIX, p.* 413. Although this act was repealed in 1899 (*Pamph. L.* 1899, *ch. 76, p. 189, subdivision* 35), the school nonetheless has continued to function thereunder by virtue of a saving clause (section 2) in the latter statute. The school later merged with Stewart College which had been established by Thomas J. Stewart in 1883. After several changes in its name, it was finally changed to Rider College by which name it is presently known.

The by-laws apparently first adopted by respondent and offered in evidence give no indication as to the date of their adoption. These by-laws provide, among other things, for two endowment funds. Article IV, sections 1 and 2. The second (section 2) provides for an endowment to consist of "gifts, contributions, bequests and devises" to respondent, and is not here involved. The first (section 1) provides for an endowment fund to consist of "all surplus moneys taken in by the college as tuition fees over and above the operating expenses of the college." It further provides that: "* * * The income from this endowment fund may be used in providing scholarships for worthy students or for supplementing the income from tuition fees in the event that the tuition fees are inadequate to provide for the current expenses of the college. No part of the principal of this endowment fund may be used for any purpose, except for necessary enlargement of the college facilities, the payment of the obli-

gations of the college, *or for such other purposes as the board of governors may unanimously determine to be necessary and essential to its welfare. * * *."* (Italics supplied.)

The by-laws further provide (article IV, section 2) that: "In the event of the final dissolution of Rider College, its net assets shall in nowise be deemed the property of its Board of Governors, or Trustees or any other person or persons, but shall be considered a trust fund for educational purposes to be distributed as such by the then existing Board of Governors, by a majority vote thereof to such other educational institutions then organized and existing under the laws of the State of New Jersey as the said Board shall determine." And article VI (Amendments) provides: "Section 1. Amendments to the by-laws may be made at the annual meeting called for the purpose by a two-thirds vote of the Board of Governors."

This was the legal set-up under which respondent operated prior to 1935. Under this set-up it was frankly admitted that it is a fair interpretation of the act of 1890, *supra,* to say that respondent could have operated thereunder for profit had it desired so to operate. That the charter and by-laws could be changed is not subject to debate. They were in fact, as we shall show, later changed.

Apart from this set-up, how, in fact, did respondent operate? *Town of Montclair* v. *State Board of Equalization of Taxes,* 86 *N. J. L.* 497; 92 *Atl. Rep.* 270; *affirmed,* 88 *N. J. L.* 374; 96 *Atl. Rep.* 44; *Dana College* v. *State Board of Tax Appeals (S. C.), supra* (at *p.* 310). Notwithstanding respondent's claim that it did not operate for a profit, the proofs negative the claim. Mr. Franklin B. Moore and Mr. John E. Gill served Rider College as president and dean, respectively for over 33 years. There is nothing to indicate that they were not well paid; the contrary is true. From time to time as business schools were established in Trenton they would, with their moneys, purchase same and merge them with Rider College. They "owned and operated" Rider College. They were able during their ownership and operation thereof, to build up an endowment fund, from tuitions and other charges made (such as registration fees, sale of

text books, maintenance, &c.) over and above operating expenses (which included liberal salaries), variously estimated between $200,000 to $300,000; the "bulletin" above referred to states this amount to be $400,000. All taxes due prosecutor were paid. There is nothing to indicate that respondent ever operated at a loss. Such a resultant financial status could not have been, nor was it made possible, on tuition fees, &c., based on actual costs of instruction.. Clearly, such operation is neither charitable, philanthropic nor without profit.

Franklin B. Moore and John E. Gill died in 1934. Their respective estates continued to operate Rider College. Franklin F. Moore and John G. Gill succeeded their respective fathers in their respective positions as president and dean of Rider College.

In April of 1935, the estates of Mr. Moore and Mr. Gill, deceased, sold and transferred their property to Rider College for the sum of $164,000 subject to two mortgages aggregating $66,000, which Rider College assumed, leaving a net consideration of $98,000. The estates also transferred to Rider College the endowment fund and gave it a release for all of their interests in the estates.

Then changes were begun. We turn to these changes.

In 1937 respondent amended its charter to read, in part, as follows: "The objects for which this association is formed: * * * (d). To conduct the affairs of the college in the accomplishment of the foregoing purpose so that no part of the net earnings of the corporation shall inure to the benefit of any private shareholder or individual." In addition, in 1938, respondent's by-laws (article 1, section 1, Control Vested in Board of Governors) were amended so that its secretary and treasurer were no longer members of the Board of Governors.

There are in fact fifteen trustees; "six are a self-perpetuating group;" "seven" are elected by the alumni organization, and the president and dean are *ex-officio* members.

This was the legal set-up under which respondent operated as of October 1st, 1939. This set-up utterly fails to indicate any fundamental change in the *modus operandi* of respondent.

*Cf. Dana College* v. *State Board of Tax Appeals, supra.* There is nothing sacrosanct about these changes. They are no more, no less, irrevocable than were the provisions of respondent's original charter and by-laws. Whether these changes were effected to gain a desired institutional standing, or to clear up ambiguities as to the application of the Federal Social Security Law, or our Unemployment Compensation Law, or otherwise, is all beside the point. The question still remains whether these changes did in fact supply the charitable and philanthropic essentials theretofore lacking and without which respondent can lay no claim to exemption. *Carteret Academy* v. *State Board, &c., supra* (at *p.* 528). Again we turn to the proofs.

On the one hand, there is proof indicating that respondent gave away for the tax year in question 134 scholarships, although we are unable, for lack of proof, to reconcile that number of scheduled scholarships with the advertised plan for granting scholarships as printed on page 156 of respondent's "bulletin;" that 50% of the number of teachers in commercial subjects in high schools in our state were graduated from, and placed by respondent; that respondent's methods of operations have received the praise and approval of the Department of Instruction for Teachers of our state and that of New York; that respondent's degrees are recognized by several of our sister states; that respondent enjoys the benefits which are given by the language of the Federal Revenue Laws to charitable organizations and that donors to respondent could likewise enjoy the benefits of said laws.

On the other hand, there is proof that, as of October 1st, 1939, respondent operated as a successful business institution "with the economic factor of profit, instead of the legislative conception of philanthropy as the basis for its existence." *Carteret Academy* v. *State Board, &c., supra* (at *p.* 528). As of October 1st, 1939, respondent owed $60,000 to the Trenton Saving Fund Society on a bond secured by a mortgage and $40,000 to the Trenton Banking Company—the form of that indebtedness is not made clear. At all events, on the day of the hearing before the State Board of Tax Appeals, February 14th, 1941, the former indebtedness had

been reduced to $39,000 and the latter had been fully paid and satisfied.

Although respondent operates on a basis of 48 weeks a year as distinguished from the general basis of 36 weeks a year on which many colleges operate, its tuition fees are fairly comparable with like colleges but indicates no deficiency, no decreasing trend, and its salaries paid are generally substantial. They are not of a self-sacrificing nature.

For the tax year in issue, respondent's gross income was $305,000; its expenditures were $288,000; it thus operated at a net profit of $17,000. Without detailing all of the expenditures, it will suffice if we point out that respondent expended $18,000 for the cost of printing its catalogue and newspaper advertisements. Respondent employed seven "vocational advisers" (whom prosecutor characterized as salesmen) at salaries ranging from $175 to $300 a month. These men—however named—were engaged to and did contact high school principals, make talks before the student bodies, to the end of increasing the enrollment of Rider College, check on the qualifications of the prospects, and pass upon their capacities.

Substantial salaries ($8,400 each) were paid to Mr. Moore and Mr. Gill as president and dean of the college, respectively. After the payments of all expenses and the payment of $15,000 on a mortgage and other indebtedness, $2,000 still remained from the $17,000 net income.

True, such surplus moneys must, in accordance with the by-laws, be added to the endowment fund, and, in accordance with the certificate of incorporation, cannot "inure to the benefit of any private share-holder or individual." But there is nothing, as already stated, legally to prevent the Board of Governors, under the present by-laws, from using the endowment fund "for such other purposes as [they] may unanimously determine to be necessary and essential to its welfare." Thus respondent's endowment fund resembles more closely the ordinary contingent reserve fund established by the average sound business corporation. Moreover, there is nothing legally to prevent the Board of Governors from altering or repealing its charter and by-laws now relied upon

by respondent in support of its claim to exemption. *Cf. Carteret Academy* v. *State Board, &c.,* 98 *N. J. L.* 868; 120 *Atl. Rep.* 736.

The case of *Borough of Princeton* v. *State Board of Taxes and Assessment,* 96 *N. J. L.* 334; 115 *Atl. Rep.* 342, is clearly distinguishable from the instant case. In the instant case, there is no testimony to indicate that the endowment fund of the school was created or even contributed to by alumni or charitable gifts. Mr. Franklin E. Moore, when asked what donations were ever made to the school, could tell of alumni contributions only towards the purchase of an athletic field, property which is· not here in question and which, even if it were involved, might, under no circumstances be tax exempt. *Cf. Stevens Institute of Technology* v. *Bowes,* 78 *N. J. L.* 205; 73 *Atl. Rep.* 38. Nor were the properties, in the instant case, given to the school by the former owners, as in the Princeton case.

There is no proof that respondent was obliged to make up deficiencies in tuition fees to pay for the actual costs of instruction, "in part by the self-sacrificing devotion of its teachers in and in part by the bounty of past generations." *Institute of Holy Angels* v. *Bender,* 79 *N. J. L.* 34, 36; 74 *Atl. Rep.* 25; *Town of Montclair* v. *State Board of Taxes, supra* (at *p.* 499).

The proof is plenary that it is respondent's policy not to accept negro students. Out of an enrollment of 1,200 students (34% come from our state and 66% come from outside our state) 900 of whom attend the day sessions and 300 of whom attend the evening sessions, there was not one negro student enrolled with respondent on October 1st, 1939, and for ten years prior thereto respondent had but "four or five" negro students, all of whom attended evening sessions. The explanation given is that respondent has "no facilities for the placement of negro students after graduation." There is nothing to indicate that respondent is either obliged to, or does, place all of its graduates. That explanation, to say the least, can hardly be said to indicate a fundamentally charitable or philanthropic basis of operation.

The proofs do show that as of October 1st, 1939, the value

of the endowment fund was approximately between $140,000 to $165,000.

The proofs further show that notwithstanding the changes effected, as lastly stated, respondent continued to pay prosecutor the taxes due on the property here involved until 1938. It did not pay the taxes for the years of 1938 and 1939 because of an agreement between prosecutor and respondent whereby the former canceled the taxes for those years upon the payment to it, by respondent, of $6,000 for each year. (See State Constitution (article IV, section VII, paragraph 12) and *N. J. S. A.* 54:4-1, requiring that all properties be assessed at its true value, and *N. J. S. A.* 54:4-96, *et seq.*, conditions under which taxes may be adjusted and settled.) Respondent argues that this agreement was effected not because it desired to avoid the payment of its just taxes but rather because the payment of taxes would, in effect, be an admission that it does not operate without profit and would thus deprive it of its scholastic standing and remove from its degrees their merited recognition. Be that as it may, that explanation begs the issue. There is no substitute for the provisions of the statute granting exemption. Its provisions must be satisfied.

In fine, our careful study of all the proofs, and legitimate inferences properly deducible therefrom, satisfies us that they are not "free from doubt;" that respondent failed to carry the burden imposed upon it by law clearly and convincingly to establish that it operated, as of October 1st, 1939, as a "fundamentally charitable institution" not for profit. *Dwight School of Englewood* v. *State Board of Tax Appeals, supra.* Respondent's real and personal property were, therefore, not entitled to be exempt from taxation for the year of 1940.

Accordingly, the judgment of the State Board of Tax Appeals is reversed, and the local assessments, as sustained by the Mercer County Board of Taxation, are affirmed.

The writ is dismissed, with costs.