GENERAL ELECTRIC COMPANY, ETC., AND DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY, PLAINTIFFS-RESPONDENTS, v. CITY OF PASSAIC, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.

Argued October 21, November 3, 1958—Decided December 22, 1958.

See also 48 *N. J. Super.* 604, 138 *A. 2d* 545.

500

502

*Mr. William N. Gurtman* argued the cause for the appellant.

*Mr. John W. Hand* argued the cause for the respondent General Electric Company (*Messrs. Evans, Hand and Evans,* attorneys).

*Mr. Theodore I. Botter,* Deputy Attorney-General, argued the cause for the respondent Division of Tax Appeals, Department of the Treasury (*Mr. David D. Furman,* Attorney-General, attorney).

*Mr. Nicholas Martini* argued the cause for Ejay Warehousing Company, *amicus curiae.*

The opinion of the court was delivered by

JACOBS, J. The defendant City of Passaic appealed to the Appellate Division from the judgment of the Division of Tax Appeals which cancelled the tax assessment for 1956 on the personal property owned by the General Electric Company and located in the warehouse operated by the Ejay Warehousing Company at 99 President Street, Passaic, New Jersey. We certified on our own motion.

The General Electric Company operates a plant at Bloomfield, New Jersey, where it manufactures air-conditioning equipment, water coolers and heat pumps. In 1954 it entered into an agreement with the White Warehousing Company for the trucking of merchandise from the Bloomfield plant and its storage at the Passaic premises which White had leased from Botany Mills, Inc. This agreement

related to the year 1955 and was assigned to Ejay Warehousing Company in May 1955. Thereafter a similar agreement for 1956 was executed directly by General Electric and Ejay. In 1955 and 1956 all of the air conditioning, water cooler and heat pump units which were manufactured at the Bloomfield plant were transferred to the Passaic warehouse. They were delivered daily to the warehouse in trucks operated by Ejay, and Ejay personnel handled their storage at the warehouse. However, General Electric did maintain an inspector whose responsibility was to check each unit at the warehouse immediately prior to its shipment to the customer. General Electric did no manufacturing at the warehouse but it did from time to time send its own employees to the warehouse to adjust or alter units to conform with newly adopted designs. No warehouse receipts were used but an I.B.M. card system was employed to record the units received and released by Ejay.

The record contains but little on the issue of whether Ejay's premises were operated as a *bona fide* public warehouse or as a business convenience for General Electric. Mr. Moreland, manager of manufacturing for the Bloomfield plant of General Electric, testified that because of the congested condition of its plant and the lack of floor space, General Electric decided to relieve itself of "the responsibility of storing and shipping" and to enter into the agreements with White and Ejay. Mr. Stump, vice-president and general manager of Ejay, testified that Ejay is owned by the Muscarelli family and that Mr. Muscarelli is in the construction business and is not financially interested in General Electric. He further testified that on October 1, 1955 there was approximately 100,000 square feet of warehouse space in Ejay's premises and that 99% of it was occupied by General Electric; the only other occupant of warehouse space was Coyle and McDonald, a rigging company affiliated with Ejay. The record is silent as to what activities, if any, Ejay ever engaged in towards soliciting warehouse business from the public generally or

towards making space available to meet any requirements of the public generally. Similarly it does not indicate how the storage rates charged to General Electric compared with the storage rates charged by public warehouses in the Passaic area or elsewhere in northern New Jersey.

In the fall of 1955 General Electric received from the assessor of the City of Passaic a communication relating to its personal property in the Ejay warehouse. It did not answer or file an account of its property (see *R. S.* 54:4–12) because its counsel had advised that the property was tax exempt under *R. S.* 54:4–3.20. Thereupon the assessor inspected the property at the warehouse and applying the 40% ratio which prevailed in the City of Passaic assessed it at $2,000,000. General Electric appealed to the county board of taxation which affirmed the assessment. General Electric then appealed to the Division of Tax Appeals which, after hearing, cancelled the assessment on the ground that the property was tax exempt under *R. S.* 54:4–3.20. The city appealed from the judgment of the Division of Tax Appeals and in support of its appeal advances the following contentions: (1) *R. S.* 54:4–3.20 is unconstitutional; (2) the Ejay premises did not constitute a warehouse within the intent and purpose of *R. S.* 54:4–3.20; (3) the judgment of the Division of Tax Appeals was not supported by appropriate findings (see *Delaware, L. & W. R. Co. v. City of Hoboken,* 10 *N. J.* 418 (1952)), and (4) the Division of Tax Appeals did not accord the initial assessment by the Passaic assessor the presumption of accuracy and validity to which it was entitled. See *General Motors Corp. v. State Bd. of Tax Appeals,* 125 *N. J. L.* 574, 575 (*E. & A.* 1940); *Central R. R. Co. of N. J. v. State Tax Dept.,* 112 *N. J. L.* 5, 8 (*E. & A.* 1933), *certiorari* denied 293 *U. S.* 568, 55 *S. Ct.* 79, 79 *L. Ed.* 667 (1934).

*R. S.* 54:4–3.20 provides that all personal property stored in a warehouse of any person, co-partnership or corporation engaged in the business of storing goods for hire shall be exempt from taxation under *chapter* 4 of *Title* 54.

It was enacted to place our public warehouses on an equal competitive footing with those of our neighboring states where no personal property taxes were imposed. See *Jersey City v. Liggett & Myers Tobacco Co.*, 14 *N. J.* 112, 113 (1953); see also the record in *Schwartz v. Essex County Board of Taxation, pp.* 167–192 (*Court of Errors & Appeals, vol.* 1710 (1943)). Its constitutionality was sustained in *Schwartz v. Essex County Board of Taxation*, 129 *N. J. L.* 129 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 177 (*E. & A.* 1943), and it has been applied in many reported decisions. See *Maritime Petroleum Corp. v. City of Jersey City*, 1 *N. J.* 287 (1949); *Dearborn Chemical Co. v. Division of Tax Appeals*, 135 *N. J. L.* 580 (*Sup. Ct.* 1947); *Crown Can Co. v. Division of Tax Appeals*, 135 *N. J. L.* 517 (*Sup. Ct.* 1947); *Pattison & Bowns, Inc., v. Saddle River Tp.*, 129 *N. J. L.* 135 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 177 (*E. & A.* 1943); *Halligan & McLellan, Inc., v. State Bd. of Tax Appeals*, 122 *N. J. L.* 551 (*Sup. Ct.* 1939); *City of Newark v. Blanchard Lumber Co.*, 21 *N. J. Misc.* 12 (*St. Bd. Tax App.* 1942); *City of Newark v. Weyerhaeuser Timber Co.*, 18 *N. J. Misc.* 560 (*St. Bd. Tax App.* 1940); *Blanchard Lumber Co. v. City of Newark*, 18 *N. J. Misc.* 32 (*St. Bd. Tax App.* 1939); *cf. Jersey City v. Liggett & Myers Tobacco Co., supra; Borough of Edgewater v. Connoil Corp.*, 4 *N. J. Super.* 338 (*App. Div.* 1949). The appellant now seeks reconsideration of the holding in the *Schwartz* case, although it does not submit any materials which were not presented to the former Supreme Court and the Court of Errors and Appeals when they sustained the constitutionality of *R. S.* 54:4–3.20.

The New Jersey Constitutions of 1776 and 1844 were silent on the subject of taxation. See *Neeld, "Taxation— The Tax Clause," 2 Proceedings of the Const. Conv. of 1947, p.* 1685 (1951). In 1875 the *Constitution of* 1844 was amended by the addition of a clause to the effect that "property shall be assessed for taxes under general laws, and by uniform rules, according to its true value." *Art.* IV, § VII, *par.* 12. Elsewhere in the country, the courts had divided

on the issue of whether such an equality and uniformity clause forbade all tax exemptions (see 1 *Cooley, Taxation,* § 273, *p.* 580 (*4th ed.* 1924)); our courts, however, soon aligned themselves with those holding the view that the clause did not prohibit the Legislature from providing for tax exemptions so long as there was proper basis and reasonable classification. *Cf. State Board of Assessors v. Central R. R. Co.,* 48 *N. J. L.* 146, 279 (*E. & A.* 1886); *Stratton v. Collins,* 43 *N. J. L.* 562, 564 (*Sup. Ct.* 1881). In the *Stratton* case Justice Dixon pointed out that the equality and uniformity clause did "not require all property to be taxed" and that it left "the legislative power of selecting the subjects of taxation as untrammeled as it ever was." See 43 *N. J. L.* at *page* 564. And in the *Central R. R.* case Chancellor Runyon had this to say (48 *N. J. L.* at *page* 279):

"The constitutional provision requires that, not only that the assessment shall be under general laws, but that it shall be by uniform rules also. It does not require that all property shall be assessed for taxes, but that property, when assessed for taxes, or in other words, such property as shall be assessed for taxes, shall be assessed under general laws, etc. Certain property has been exempt from taxation ever since the amendments to the constitution were adopted, and such exemption has received the judicial sanction. The property is of the same kind as that which is taxed, but the use to which it is devoted—the purposes of religion, education, benevolence, etc.,—makes it a class and justifies the exemption.

The constitutional provision does not take away from the legislature the power of selecting the subjects of taxation. *State v. Runyon,* 41 *N. J. L.* 98; *State v. Collins,* 43 *N. J. L.* 562. But it does require that all the members of the class selected shall be included in the taxing law, and that the rule applied thereto shall be uniform as to the whole of the class, and that the assessment shall be made at the true value of the property constituting the class; and if these requirements are answered by the law, it is not in conflict with the constitutional provision."

See also *Essex County Park Commission v. Town of West Orange,* 77 *N. J. L.* 575, 577 (*E. & A.* 1909); *Trustees for Support of Public Schools v. Inhabitants of City of Trenton,* 30 *N. J. Eq.* 667, 677 (*E. & A.* 1879); *City of Camden v. Camden County Board of Taxation,* 121 *N. J. L.*

262, 264 (*Sup. Ct.* 1938), affirmed 122 *N. J. L.* 381 (*E. & A.* 1939); *Tippett v. McGrath,* 70 *N. J. L.* 110, 112 (*Sup. Ct.* 1903), affirmed 71 *N. J. L.* 338 (*E. & A.* 1904); *State, Trenton Iron Co., pros., v. Yard,* 42 *N. J. L.* 357, 363 (*Sup. Ct.* 1880).

In *Tippett v. McGrath, supra,* Justice Garrison recognized that the constitutional amendment did not withdraw the legislative power to exempt certain classes of property from taxation, and cited the numerous decisions which had sustained statutes exempting "colleges, seminaries of learning, buildings used exclusively for religious worship, cemeteries, the property of hospitals and the buildings and land of numerous charitable institutions" (see *R. S.* 54:4–3 *et seq.*); and he summarized the purport of these decisions to be "that the Legislature may, for the purpose of exemption from taxation, classify property either by some common feature possessed by it, or by the uses to which it is put by its owners." In the case before him the Legislature had granted a partial tax exemption to persons enrolled as active members of any fire company; in striking this down he pointed out that the exemption did not rest on any characteristics of the property or use to which it was put but rested on "the personal *status* of the owners," a basis which he considered to be wholly improper. Later cases have expressed complete approval of this view. See *N. J. Turnpike Authority v. Washington Tp.,* 16 *N. J.* 38, 44 (1954); *State v. Mercer County Board of Taxation,* 118 *N. J. L.* 408, 410 (*Sup. Ct.* 1937).

In *Essex County Park Commission v. Town of West Orange, supra,* the court struck down a statute which sought to impose a tax on county property and on property owned by a taxing district but located in another taxing district. It pointed out that the result of the statute was to remove certain property from the pre-existing tax exemption applicable to governmentally-owned property and that the only distinction was its ownership and location; and while it acknowledged that exemptions were lawful where the underlying classifications were proper, it expressed the view that

a classification which was simply based on the accident of location of the property was insufficient. In *City of Camden v. Camden County Board of Taxation, supra* [121 *N. J. L.* 262], Chief Justice Brogan noted that the classification in the *Essex County Park Commission* case "was held unconstitutional because it was not general and was in fact arbitrary." See *Jersey City v. Blum,* 101 *N. J. L.* 93, 95 *(E. & A.* 1925); *City of Newark v. Borough of West Paterson,* 2 *N. J. Misc.* 190 *(Sup. Ct.* 1924); *Borough of Secaucus v. Huber,* 87 *N. J. L.* 464 *(Sup. Ct.* 1915).

When the *Schwartz* case was presented to the former Supreme Court and the Court of Errors and Appeals, counsel urged that the warehouse exemption statute *(R. S.* 54:4–3.20) was invalid under the principles expressed in the *Tippett* and *Essex County Park Commission* cases. He contended that exemptions from taxation may be based only upon either the characteristics of the personal property or the use to which it was put. The court rejected this contention. In the opinion by Justice Colie, it took the position that the Legislature had power to classify objects of legislation; that this power included classifications for the purpose of taxation and exemption from taxation; and that the Legislature could exercise its discretion to classify so long as the classification rested upon "substantial distinction," had "a logical and reasonable basis," and included all property while omitting none "falling within the named classification." See 129 *N. J. L.* at *pages* 133–134. This approach was consistent with that taken in other states which recognize a legislative power to grant tax exemptions *(Allen v. Multnomah County,* 179 *Or.* 548, 173 *P. 2d* 475 *(Sup. Ct.* 1946); *Opinion of Justices,* 141 *Me.* 422, 42 *A. 2d* 47 *(Sup. Ct.* 1945); *State ex. rel. Struble v. Davis,* 132 *Ohio St.* 555, 9 *N. E. 2d* 684 *(Sup. Ct.* 1937); *Cooley, Taxation, supra* §§ 273, 280; 84 *C. J. S. Taxation* § 216, *p.* 414 (1954)), and with the broad principles expressed by our courts when dealing with the constitutional validity of legislative classifications in other fields. See *N. J. Restaurant Ass'n, Inc., v. Holderman,* 24 *N. J.* 295, 300 (1957);

*State v. Garden State Racing Ass'n,* 136 *N. J. L.* 173, 177 (*E. & A.* 1947); *Hotel Suburban System v. Holderman,* 42 *N. J. Super.* 84, 92–94 (*App. Div.* 1956).

The warehouse exemption which was originally adopted in 1925 and was later sustained in *Schwartz* did not rest on the personal status of the owner as in *Tippett,* nor was it arbitrarily based on the accident of location as in *Essex County Park Commission.* See *Maritime Petroleum Corp. v. City of Jersey City, supra,* 1 *N. J.* 287, at *page* 297. It was based on the legislative policy to further the common good by encouraging the development of New Jersey's public warehouse industry which was then unable to compete fairly with public warehouses in our neighboring states where no personal property tax imposts were applicable. The introducer's statement attached to the warehouse exemption bill (see *Deaney v. Linen Thread Co.,* 19 *N. J.* 578, 584–585 (1955)), after stating its object, opined that "any loss of taxes in the State of New Jersey would be more than offset by the increase of taxable property of New Jersey warehousemen resulting from their growth." See *Assembly No.* 408 (1925). The power of a Legislature to foster a particular industry development in the public interest by appropriately based exemption from personal property taxation has received judicial recognition elsewhere. See *Todd County v. Bond Bros.,* 300 *Ky.* 224, 188 *S. W. 2d* 325 (*Ct. App.* 1945). *Cf. Burlington Distilling Co. v. State Bd. of Assessors,* 86 *N. J. L.* 92, 94 (*Sup. Ct.* 1914), affirmed 87 *N. J. L.* 315 (*E. & A.* 1915); *Department of Labor & Industry v. New Enterprise, etc.,* 352 *Pa.* 413, 43 *A. 2d* 90 (*Sup. Ct.* 1945).

In *Schwartz* the court cited *Carmichael v. Southern Coal & Coke Co.,* 301 *U. S.* 495, 57 *S. Ct.* 868, 872, 81 *L. Ed.* 1245 (1937), for the well-settled doctrine that the due process and equal protection clauses of the Federal Constitution do not prohibit a state legislature from selecting subjects of taxation and exemption from taxation. There Justice Stone, in sustaining the Unemployment Compensation Act of Alabama, noted (1) that the Federal Constitution does

not impose upon a state "any rigid rule of equality of taxation"; (2) that "inequalities which result from a singling out of one particular class for taxation or exemption infringe no constitutional limitation"; and (3) that a legislature may make "distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it." The appellant here urges that *Carmichael* did not involve personal property taxation but was concerned with an indirect tax on "trades and occupations"; but it is clear that the principles expressed in *Carmichael* (as well as those expressed in *Schwartz*) apply equally to personal property taxation and indirect taxation on trades and occupations. See *Heisler v. Thomas Colliery Co.,* 260 *U. S.* 245, 43 *S. Ct.* 83, 67 *L. Ed.* 237 (1922); *State ex rel. Struble v. Davis, supra. Cf. State Bd. of Tax Commissioners of Indiana v. Jackson,* 283 *U. S.* 527, 537, 51 *S. Ct.* 540, 543, 75 *L. Ed.* 1248, 1256 (1931), where Justice Roberts noted that the equal protection clause "does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations." See *Independent Warehouses, Inc., v. Scheele,* 331 *U. S.* 70, 67 *S. Ct.* 1062, 91 *L. Ed.* 1346 (1947).

In the light of all of the foregoing and the customary judicial presumption which favors constitutionality (*In re Village of Loch Arbour,* 25 *N. J.* 258, 264 (1957)), we would not be warranted in departing from the holding in *Schwartz* that *R. S.* 54:4–3.20 was not in violation of the 1844 *Constitution* as amended. And while no attack has been made under the 1947 *Constitution* (see *Washington National Ins. Co. v. Board of Review,* 1 *N. J.* 545, 550 (1949)), it seemingly contains nothing which would prohibit the Legislature from granting personal property tax exemptions by general legislation so long as there was proper basis and reasonable classification. See *Const* 1947, *Art.* IV,

§ VII, *par.* 9(6); *Art.* VIII, § I, *par.* 1; *Art.* VIII, § I, *par.* 2; *Art.* VIII, § I, *par.* 3. Accordingly, we need not now deal with the Attorney General's contention that under the second sentence in *Art.* VIII, § I, *par.* 2, of the 1947 *Constitution* this court would be obliged to sustain *R. S.* 54:4–3.20 even if it entertained the view that the decision in *Schwartz* was insupportable. *Cf.* 1 *Proceedings of the Const. Conv. of 1947, pp.* 752, 798 (1949).

 Although the warehouse exemption embodied in *R. S.* 54:4–3.20 has been declared to be constitutional, it must be applied narrowly and with great caution for it represents a departure from the fundamental principle that all property shall bear its just and equal share of the public burden of taxation. See *Julius Roehrs Co. v. Div. of Tax Appeals,* 16 *N. J.* 493, 497 (1954); *N. J. Turnpike Authority v. Washington Tp., supra,* 16 *N. J.* at *page* 44; *Board of National Missions, etc., v. Neeld,* 9 *N. J.* 349, 353 (1952). *Cf. Atlantic Coast Line R. Co. v. Phillips,* 332 *U. S.* 168, 67 *S. Ct.* 1584, 91 *L. Ed.* 1977 (1947). The objective of the statutory exemption, as hereinbefore noted, was to place our public warehouses on an equal competitive footing with those of our neighboring states where no personal property taxes were imposed, and the holding of constitutionality was grounded strictly on that objective. The taxpayer's claim of exemption must be carefully scrutinized and if the particular circumstances disclose that the statutory policy is not being furthered the exemption must be denied. *Cf. Jersey City v. Liggett & Myers Tobacco Co., supra; Borough of Edgewater v. Connoil Corp., supra.*

In *Liggett & Myers* this court declined to apply the exemption in a case where the taxpayer did not place its property in a public warehouse with customary bailor-bailee relationship and control by the warehouseman, but placed its property in a portion of the warehouse which the taxpayer leased and controlled under a landlord-tenant relationship. And in *Connoil* the Appellate Division struck down a claimed exemption where the taxpayer sublet, at a nominal rental, storage tanks to the Lawrence Warehouse Company

and entered into a contract under which the Warehouse Company agreed to store and handle the taxpayer's petroleum products and to extend [4 *N. J. Super.* 338] "the full benefit of its facilities and experience as a field warehouseman." The taxpayer dictated whether others might store their petroleum products in the tanks, and the Warehouse Company would not accept any other storers without the taxpayer's consent. The court found that there was no *bona fide* warehouse relationship between the Warehouse Company and the taxpayer and that the taxpayer had not brought itself within the statutory exemption; in the course of his opinion for the court, Judge Eastwood approvingly quoted from *City of Trenton v. State Board of Tax Appeals,* 127 *N. J. L.* 105, 106 (*Sup. Ct.* 1941), affirmed *City of Trenton v. Rider College,* 128 *N. J. L.* 320 (*E. & A.* 1942), where the court said:

"The applicable legal principles present no difficulty. The right to the claimed statutory exemption depends entirely upon the facts and circumstances of each particular case. *Dana College v. State Board of Tax Appeals,* 14 *N. J. Misc.* 308, 310, 184 *A.* 412; affirmed 117 *N. J. L.* 530, 189 *A.* 620. Since statutes granting exemption from taxation are in the nature of a 'renunciation of sovereignty,' and are at war with the sound basic principle that the 'burden of taxation ought to fall equally upon all,' they are most 'strongly construed' against those claiming exemption. Thus the facts and circumstances in each case must clearly and convincingly establish the right to exemption within the statute granting exemption, otherwise the general rule is invoked which subjects 'all property to a just share of the public burdens.' *Princeton Country Day School v. State Board, etc.,* 113 *N. J. L.* 515, 517, 175 *A.* 136; *Carteret Academy v. State Board of Taxes and Assessment,* 102 *N. J. L.* 525, 133 *A.* 886; affirmed 104 *N. J. L.* 165, 138 *A.* 919. Otherwise stated, the proofs must be 'free from fair doubt.' *Carteret Academy v. State Board, etc., supra* (102 *N. J. L.* at *page* 529). The burden of proof is upon the claimant to establish the asserted right to exemption. *Dwight School of Englewood v. State Board of Tax Appeals,* 114 *N. J. L.* 594, 599, 177 *A.* 875; affirmed 117 *N. J. L.* 113, 187 *A.* 36."

In the instant matter the Division of Tax Appeals described the fact that General Electric occupied most of Ejay's warehouse space as "inconsequential" because it en-

tertained the view that under *Maritime Petroleum Corp. v. City of Jersey City, supra,* the statutory exemption would be applicable even if Ejay's premises were viewed as a private rather than a public warehouse. In *Connoil* the court distinguished *Maritime,* pointing out that there the warehouse company was "engaged in the public warehousing business, owned and maintained tanks for the sale of its storage facilities, accepted petroleum products from all who desired to store same," and "issued warehouse receipts therefor." See 4 *N. J. Super.* at *page* 341. While the opinion in *Maritime* does contain a *dictum* to the effect that the statutory exemption applies to private as well as public warehouses, it expressly recognizes that the legislative policy was not "to alleviate the burden of the individual owners of the property" but was to foster New Jersey's warehouse industry which was at a competitive disadvantage with "tax-free warehouses of neighboring states." See 1 *N. J.* at *pages* 295–296. The history of the statutory exemption, as fully discussed in the record in the *Schwartz* case, contains ample evidence of the limited legislative purpose. This history, buttressed by the applicable principles of statutory construction, require that the statute be construed narrowly so as to exclude private warehouses created or operated for the taxpayer's convenience; a broader construction would enable ready evasions and might perhaps impair the stated constitutional justification for the entire exemption.

 If the taxpayer stores its property in a well-established or newly created public warehouse, genuinely operated as such, it is entitled to the benefit of the statutory exemption. See *City of Newark v. Weyerhaeuser Timber Co., supra,* 18 *N. J. Misc.* at *page* 563. On the other hand, if it stores its property in a warehouse created or operated for its own private convenience and not genuinely operated as a public warehouse, then the statutory exemption must be deemed inapplicable, for here the statutory objective is not being served and no justifiable basis exists for favoring such personal property as against personal property stored at premises of taxpayers generally. We believe that, in fair-

ness to the parties, the record should be supplemented to shed whatever additional light may be available on the foregoing issue; in particular there should be full exploration of the activities engaged in by Ejay (and its predecessor White) towards soliciting business from the public and towards making space available to meet any requirements of the public, and evidence should be presented as to how the storage rates charged to General Electric compared with the storage rates charged by *bona fide* public warehouses in the Passaic area or elsewhere in northern New Jersey. On the basis of all of the testimony, as supplemented by the aforementioned and by any other relevant evidence which may be introduced, the Division of Tax Appeals should make appropriate findings of fact and should express its determination as to whether the claim of exemption has been affirmatively sustained by General Electric under the principles hereinbefore set forth. Whether the Division upholds or rejects the exemption, it should, in addition, pass on the valuation issue which has been raised by the taxpayer and thus afford to the court a complete record in the event of further judicial proceedings.

The judgment is reversed and the cause is remanded to the Division of Tax Appeals for further proceedings in conformity with this opinion.

HEHER, J. (concurring in remand). However it may be viewed under *Art.* IV, *Sec.* VII, *par.* 12 of the 1844 *State Constitution,* as amended September 28, 1875, *R. S.* 54:4–3.20, as interpreted and applied in *Schwartz v. Essex County Board of Taxation,* 129 *N. J. L.* 129 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 177 (*E. & A.* 1943), would seem to be within the purview of *Art.* VIII, *Sec.* I, *par.* 2 of the 1947 *State Constitution,* providing that exemption from taxation may be granted only by "general laws" and "[u]ntil otherwise provided by law all exemptions from taxation validly granted and now in existence shall be continued." In *Schwartz* the holding was that the cited "exemption statute applies to all personal property stored in a

warehouse and it includes all property within the state so situated, omitting none." Can we say that the framers of the 1947 *Constitution* had the exemption statute in view, as so interpreted, and that dissent from the policy would have found expression in the new draft of the organic law, embracing as it does a new exemption provision, *Art.* VIII, *Sec.* I, *par.* 2, following consideration of the subject matter in committee and on the floor? Ordinarily, the constitutional sufficiency of legislation is measured by the organic law in force when the act was adopted. Here, the exemptions continued are those "validly granted." It is not unlikely that the Convention, knowing of the provision, determined not to disturb it by a different or more explicit expression of constitutional policy. At all events, in *Maritime Petroleum Corporation v. City of Jersey City*, 1 *N. J.* 287 (1949), this court proceeded on the assumption that such exemptions are constitutionally sound. The equal protection and due process clauses of the Fourteenth Amendment to the Federal Constitution as delineated in *Carmichael v. Southern Coal & Coke Co.*, 301 *U. S.* 495, 57 *S. Ct.* 868, 81 *L. Ed.* 1245 (1937), do not resolve the issue. The basic inquiry here is the essential meaning of the exemption statute.

This court now holds that "[i]f the taxpayer stores its property in a well-established or newly created public warehouse, genuinely operated as such, it is entitled to the benefit of the statutory exemption"; but "* * * if it stores its property in a warehouse created or operated for its own private convenience and not genuinely operated as a public warehouse, then the statutory exemption must be deemed inapplicable for here the statutory objective is not being served and no justifiable basis exists for favoring such personal property as against personal property stored at premises of taxpayers generally." The majority opinion then refers to *Borough of Edgewater v. Connoil Corporation*, 4 *N. J. Super.* 338 (*App. Div.* 1949); and it is said that "the court [there] distinguished" *Maritime Petroleum Corporation v. City of Jersey City, supra,* "pointing out that

there the warehouse company was 'engaged in the public warehousing business, owned and maintained tanks for the sale of its storage facilities, accepted petroleum products from all who desired to store same,' and 'issued warehouse receipts therefor,' " seemingly determinative considerations leading to the ultimate standard and rule of action laid down in the majority opinion here, as stated *supra*.

But I deem this to be an illusory criterion. *R. S.* 54:4–3.20 makes no reference to a "public" warehouse: "All personal property stored in a warehouse" of one "engaged in the business of storing goods for hire" is rendered immune from taxation. The Uniform Warehouse Receipts Law of 1907, *R. S.* 57:1–1 *et seq.*, defines "warehouseman" as "a person lawfully engaged in the business of storing goods for profit." "Goods" means "chattels or merchandise in storage, or which has been or is about to be stored." *Ibid.* As pointed out in *Maritime,* a common carrier storing goods at the instance of the consignor has been held to be a warehouseman under the duty of reasonable care. *Armstrong Rubber Co. v. Erie R. R. Co.,* 103 *N. J. L.* 579 (*Sup. Ct.* 1927). And a garage keeper storing automobiles for hire is a warehouseman charged with a like duty. *New Jersey Mfrs. Ass'n Fire Insurance Co. v. Galowitz,* 106 *N. J. L.* 493 (*E. & A.* 1930). As said in *Maritime,* the policy of the exemption "is to place such warehouses on an economic parity with the tax-free warehouses of neighboring states, and thus to lend the aid and encouragement found essential to the provision of such facilities in New Jersey and thereby to serve the general welfare rather than to alleviate the burden of the individual owners of the property"; such tax immunity "does not rest in the inherent characteristics of the property, nor in the use to which it is put, but rather in the location and relation of the property to a business the exemption was designed to serve in the common interest."

And, as there also said, the Uniform Warehouse Receipts Act was primarily designed to achieve uniformity in the law relating to warehouse receipts and thus to effect the secure and ready use of such receipts as instruments of

title and credit. The act applies to all warehousemen "engaged in the business of storing goods for profit," not to "public" warehousemen alone; and the issuance of warehouse receipts is not determinative of the legal existence of a warehouse. *R. S.* 57:1–4 *et seq.* See *Halligan & McLellan, Inc., v. State Board of Tax Appeals,* 122 *N. J. L.* 551 (*Sup. Ct.* 1939).

There is no rational distinction in this regard between "public" and "private" warehouses. Warehouses are sometimes deemed "public" in the sense that they perform a function affected with a public interest and are therefore subject to governmental regulation for the common good. *E. g. Townsend v. Yeomans,* 301 *U. S.* 441, 57 *S. Ct.* 842, 81 *L. Ed.* 1210 (1937). But warehousing is generally considered a business operation of concern only to the warehouseman and the private persons for whom he stores goods. For most purposes a distinction between public and private warehousemen is of no moment; the law ordinarily does not require a warehouseman to hold himself out to the general public as such. *National Union Bank of Reading v. Shearer,* 225 *Pa.* 470, 74 *A.* 351 (*Sup. Ct.* 1909); *Carley v. Offutt & Blackburn,* 136 *Ky.* 212, 124 *S. W.* 280, 26 *L. R. A., N. S.,* 1114 (*Ct. App.* 1910). See 56 *Am. Jur., Warehouses,* §§ 4, 8, 9.

There is no reason in principle for distinguishing in regard to such *ad valorem* taxation between "public" and private warehouses even where the "private" warehouse is used for the storage of the goods of a single customer and is not open to others, certainly so where there is independent ownership, management and control of the warehouse; and there is no evidence *contra* here, either direct or circumstantial, although the inquiry was less than exhaustive. Our statute does not embody a different policy. There can be no doubt of that.

The Legislature may, for good reason related to the general welfare, classify warehousing as a public employment, even where the warehouse is established and conducted by private individuals. *Munn v. Illinois,* 94 *U. S.* 113,

24 *L. Ed.* 77 (1876); *People v. Budd,* 117 *N. Y.* 1, 22 *N. E.* 670, 5 *L. R. A.* 559 (*Ct. App.* 1889), affirmed 143 *U. S.* 517, 12 *S. Ct.* 468, 36 *L. Ed.* 247 (1891); *People ex rel. Annan v. Walsh,* 117 *N. Y.* 1, 117 *N. Y.* 621, 22 *N. E.* 670, 682, 5 *L. R. A.* 559 (*Ct. App.* 1889), affirmed 143 *U. S.* 517, 12 *S. Ct.* 468, 36 *L. Ed.* 247 (1891). But this the Legislature has not done. The exemption statute covers all goods and personal property stored in "a warehouse"; and to differentiate in this behalf between "public" and "private" warehouses, without more, and exempt the one from taxation but not the other, is to indulge in arbitrary classification at war with fundamental law. *Washington National Ins. Co. v. Board of Review,* 1 *N. J.* 545 (1949). In *Schwartz,* as said *supra,* the statute was read as extending to all personal property stored in "a warehouse," including "all property within the state so situated, omitting none." This was the accepted interpretation of the act when the 1947 *Constitution* was framed and approved by the people. And thereafter, in *Maritime,* the new Supreme Court unanimously held the exemption applicable "to all warehouses whether public or private."

It cannot matter, in the fulfillment of the legislative policy of protecting New Jersey warehouses against the competitive inequality arising from the immunity of foreign warehouses from such taxation, whether the particular warehouse has at a given time one, two or three or several or many customers. The classification is determined by the avowed economic purpose in the service of the common weal; and, so viewed, this proffered distinction is unreal and discriminatory.

We are not here concerned with a mere pretense of independent warehousing planned to secure freedom from *ad valorem* taxation. Without hypothesizing the circumstances that would preclude such exemption, and even though on the record made below the action of the State Division could well be affirmed, I consider it to be in the common and individual interest that the cause be remanded for a full exploration of the facts and circumstances and a determina-

tion in the context of the foregoing principles rather than the standard laid down by the majority, as I conceive it.

HEHER, J., concurring in result.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For affirmance*—None.