## READING COMPANY
### v.
### The UNITED STATES.
### No. 117-57.

United States Court of Claims.
May 10, 1963.

John D. Heckert, Washington, D. C., for plaintiff. William P. McClure, Washington, D. C., H. Merle Mulloy, A. W. Hesse, Jr. and W. P. Quinn, Philadelphia, Pa., were on the briefs.

John Charles Ranney, Washington, D. C., with whom was Acting Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DURFEE, Judge.

This is a suit by the Reading Company, a common carrier by railroad, to recover unpaid demurrage charges which accrued on rail shipments for defendant.

During 1953 and 1954, plaintiff in conjunction with other railroads transported cotton-seed oil in tank cars under commercial bills of lading for the Commodity Credit Corporation, an agency of the United States, and delivered the oil to the National Molasses Company at its storage facilities located at Port Richmond, Philadelphia, Pennsylvania and Port Reading, New Jersey. Prior to these deliveries, the National Molasses Company, a Pennsylvania corporation, had entered into storage contracts with the Commodity Credit Corporation for the storage of the Government's cotton-seed oil.

The liability of the Government for payment of plaintiff's charges for line-haul transportation to the storage facilities of the National Molasses Company is not in question. The dispute is whether defendant is also liable for payment of demurrage charges accruing on these tank cars, released back to plaintiff by the National Molasses Company after the expiration of the free time allowed for unloading under national tariffs. Defendant contends that the National Molasses Company is liable under a separate "average agreement" made by that company with plaintiff pursuant to national demurrage tariffs. There are two methods of computing demurrage charges under these tariffs,—(1) straight de-

murrage as claimed here by plaintiff against defendant, and (2) demurrage charges under an "average agreement," such as existed between plaintiff and the National Molasses Company.

However, this "average agreement" for averaging demurrage penalties is governed by section G–2 of Rule No. 9 of the National Car Demurrage Tariff No. 4–A which provides:

"Cars consigned, reconsigned, or ordered to a public elevator, public warehouse, cotton compress, processing or fabricating plant, serving various parties, shall be combined in one average agreement, and the party signing the agreement as principal shall assume responsibility for all demurrage assessible thereunder."

The parties have stipulated that the issue in suit is "whether the National Molasses Company is a public elevator, public warehouse, industrial plant, cotton compress, processing or fabricating plant serving various parties within the terms of paragraph 2, Section G, Rule No. 9 of Tariff 4–A," as hereinbefore quoted.

The trial commissioner has found that the evidence was undisputed that the National Molasses Company's facilities were not a cotton compress, processing or fabricating plant, nor were they capable of storing grain, and we adopt this finding. Accordingly, if the quoted provisions of Tariff 4–A are to apply to the National Molasses Company under the stipulation, this company must be a "public warehouse."

A "public warehouse" is generally defined as a place that is held out to the public as being one where any member of the public, who is willing to pay the regular charge, may store his goods and then sell or pledge them by transferring the receipt given him by the keeper or manager. 93 C.J.S. Warehousemen & Safe Depositaries § 1, p. 396; 56 Am. Jur. p. 321.

One of the National Molasses Company storage facilities utilized by the Government was located at Port Reading, New Jersey. In General Electric Company v. City of Passaic, 28 N.J. 499, 147 A.2d 233 (N.J.1958), the New Jersey Supreme Court pointed out that the distinction between a public and a private warehouse company rested on whether the company solicited business from the public, made space available to meet public needs, and whether the storage rates were comparable to the rates charged by bona fide public warehouses in the area.

The evidence and the specific findings thereon establish that the original corporate purposes of the National Molasses Company in Pennsylvania were for generally dealing and trading in molasses and other similar products. In 1952, the articles of incorporation were amended to add "warehousing" of the same products.

The National Molasses Company was never licensed as a public warehouse by public authority, and the company never held itself out to the public as willing to store materials at public rates. The company negotiated contracts for storage with only three concerns, including defendant. The quantity of materials handled for all three concerns for the years 1953 and 1954 here in issue approximated one percent of the total materials handled and stored by the National Molasses Company for its own account. These contracts for storage were entered into by the National Molasses Company because in 1953 and 1954 it had some surplus storage capacity for which it could contract without interfering with its principal business of purchasing, storing and selling black-strap molasses in its own behalf. The company never declared, published or filed fixed or regular rates or tariffs for warehousing or storage, and there is no evidence that the rates it charged the Government were in any way comparable to storage rates. We conclude that the National Molasses Company was not a "public warehouse serving various parties" within the terms of paragraph 2, section G, Rule 9 of Tariff 4–A.

Defendant now also contends that plaintiff was on notice that the Government would not be liable for demurrage charges. Despite the previous limitation of the sole issue by stipulation, we shall dispose of this added contention.

The shipments in suit moved on commercial bills of lading which were endorsed as follows:

"This shipment is the property of, and the freight charges are assumed by the United States Government (CCC). All line-haul and accessorial charges accruing prior to arrival at destination and including accessorial charges accruing prior to expiration of free time will be paid by the PMA Commodity Office at 120 Marais St., New Orleans, La. Carrier is notified to submit the original and two copies of the freight bill for payment to the office indicated above." (finding 2)

Although the bill of lading constituted a contract between plaintiff and defendant, it does not state that the Government would not be liable for line-haul and accessorial charges accruing after expiration of free time, but merely specifies the place where payment would be made for charges accruing prior to the expiration of free time. The demurrage bills in suit were originally submitted by plaintiff to the National Molasses Company with an understanding between them that the National Molasses Company would forward them to defendant for payment. Thereafter, payment was refused by defendant. Upon this refusal, plaintiff then notified the National Molasses Company that it would hold that company liable under the demurrage average agreement, but payment was never made. The effort by plaintiff to collect from the National Molasses Company, after defendant refused payment, did not estop plaintiff from asserting its claim against the Government, now in suit.

We find that the National Molasses Company was not a "public warehouse" within the terms of the applicable tariff,

and conclude that the Government is liable for payment. The amount of plaintiff's claim in the sum of $12,981 is not disputed, and judgment is entered for plaintiff in this amount.