Dureee, Judge,
delivered the opinion of the court:
This is a suit by the Reading Company, a common carrier by railroad, to recover unpaid demurrage charges which accrued on rail shipments for defendant.
During 1953 and 1954, plaintiff in conjunction with other railroads transported cotton-seed oil in tank cars under commercial bills of lading for the Commodity Credit Corporation, an agency of the United States, and delivered the oil to the National Molasses Company at its storage facilities located at Port Richmond, Philadelphia, Pennsylvania and Port Reading, New Jersey. Prior to these deliveries, the National Molasses Company, a Pennsylvania corporation, had entered into storage contracts with the Commodity Credit Corporation for the storage of the Government’s cotton-seed oil.
The liability of the Government for payment of plaintiff’s charges for line-haul transportation to the storage facilities of the National Molasses Company is not in question. The dispute is whether defendant is also liable for payment of demurrage charges accruing on these tank cars, released back to plaintiff by the National Molasses Company after the expiration of the free time allowed for unloading under national tariffs. Defendant contends that the National Molasses Company is liable under a separate “average agreement” made by that company with plaintiff pursuant to national demurrage tariffs. There are two methods of com *730 puting demurrage charges under these tariffs, — (1) straight demurrage as claimed here by plaintiff against defendant, and (2) demurrage charges under an “average agreement,” such as existed between plaintiff and the National Molasses Company.
However, this “average agreement” for averaging demur-rage penalties is governed by section G-2 of Rule No. 9 of the National Car Demurrage Tariff No. 4-A which provides:
Cars consigned, reconsigned, or ordered to a public elevator, public warehouse, cotton compress, processing or fabricating plant, serving various parties, shall be combined in one average agreement, and the party signing the agreement as principal shall assume responsibility for all demurrage assessable thereunder.
The parties have stipulated that the issue in suit is “whether the National Molasses Company is a public elevator, public warehouse, industrial plant, cotton compress, processing or fabricating plant serving various parties within the terms of paragraph 2, Section G, Rule No. 9 of Tariff 4-A,” as hereinbefore quoted.
The trial commissioner has found that the evidence was undisputed that the National Molasses Company’s facilities were not a cotton compress, processing or fabricating plant, nor were they capable of storing grain, and we adopt this finding. Accordingly, if the quoted provisions of Tariff 4-A are to apply to the National Molasses Company under the stipulation, this company must be a “public warehouse.”
A “public warehouse” is generally defined as a place that is held out to the public as being one where any member of the public, who is willing to pay the regular charge, may store his goods and then sell or pledge them by transferring the receipt given him by the keeper or manager. 93 C.J.S., p. 396; 56 Am. Jur. p. 321.
One of the National Molasses Company storage facilities utilized by the Government was located at Port Heading, New Jersey. In General Electric company v. City of Passaic, 147 A. 2d 233 (N.J. 1958), the New Jersey Supreme Court pointed out that the distinction between a public and a private warehouse company rested on whether the company solicited business from the public, made space available to *731 meet public needs, and whether the storage rates were comparable to the rates charged by bona fide public warehouses in the area.
The evidence and the specific findings thereon establish that the original corporate purposes of the National Molasses Company in Pennsylvania were for generally dealing and trading in molasses and other similar products. In 1952, the articles of incorporation were amended to add “warehousing” of the same products.
The National Molasses Company was never licensed as a public warehouse by public authority, and the company never held itself out to the public as willing to store materials at public rates. The company negotiated contracts for storage with only three concerns, including defendant. The quantity of materials handled for all three concerns for the years 1953 and 1954 here in issue approximated one percent of the total materials handled and stored by the National Molasses Company for its own account. These contracts for storage were entered into by the National Molasses Company because in 1953 and 1954 it had some surplus storage capacity for which it could contract without interfering with its principal business of purchasing, storing and selling black-strap molasses in its own behalf. The company never declared, published or filed fixed or regular rates or tariffs for warehousing or storage, and there is no evidence that the rates it charged the Government were in any way comparable to storage rates. We conclude that the National Molasses Company was not a “public warehouse serving various parties” within the terms of paragraph 2, section G, Rule 9 of Tariff 4-A.
Defendant now also contends that plaintiff was on notice that the Government would not be liable for demurrage charges. Despite the previous limitation of the sole issue by stipulation, we shall dispose of this added contention.
The shipments in suit moved on commercial bills of lading which were endorsed as follows:
This shipment is the property of, and the freight charges are assumed by the United States Government (CCC). All line-haul and accessorial charges accruing prior to arrival at destination and including accessorial *732 charges accruing prior to expiration of free time will be Said by the PMA Commodity Office at 120 Marais St., ew Orleans, La. Carrier is notified to submit the original and two copies of the freight bill for payment to the office indicated above, (finding 2)
Although the bill of lading constituted a contract between plaintiff and defendant, it does not state that the Government would not be liable for line-haul and accessorial charges accruing after expiration of free time, but merely specifies the place where payment would be made for charges accruing prior to the expiration of free time. The demurrage bills in suit were originally submitted by plaintiff to the National Molasses Company with an understanding between them that the National Molasses Company would forward them to defendant for payment. Thereafter, payment was refused by defendant. Upon this refusal, plaintiff then notified the National Molasses Company that it would hold that company liable under the demurrage average agreement, but payment was never made. The effort by plaintiff to collect from the National Molasses Company, after defendant refused payment, did not estop plaintiff from asserting its claim against the Government, now in suit.
We find that the National Molasses Company was not a “public warehouse” within the terms of the applicable tariff, and conclude that the Government is liable for payment. The amount of plaintiff’s claim in the sum of $12,981 is not disputed, and judgment is entered for plaintiff in this amount.
FINBINGS OK FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation engaged in interstate commerce as a common carrier by railroad of passengers and freight for hire.
2. On various dates during 1953 and 1954, plaintiff, in conjunction with other railroad carriers, transported cottonseed oil for the Commodity Credit Corporation, an agency of the United States, from various points in the United *733 States and delivered the oil to the National Molasses Company at Port Richmond, Philadelphia, Pennsylvania, and at Port Reading, New Jersey. These shipments moved on uniform straight bills of lading carrying the following endorsement:
This shipment is the property of, and the freight charges are assumed by the United States Government (CCC). All line-haul and accessorial charges accruing prior to arrival at destination and including accessorial charges accruing prior to expiration of free time will be paid by the PMA Commodity Office at 120 Marais St., New Orleans, La. Carrier is notified to submit the original and two copies of the freight bill for payment to the office indicated above.
3. The shipments, after being weighed in the cars by independent weighers, were unloaded by the National Molasses Company of Oreland, Pennsylvania, and placed into the storage facilities of National Molasses Company at Port Reading, New Jersey, and Port Richmond, Philadelphia, Pennsylvania. This storage was pursuant to contracts entered into between National Molasses Company and defendant through the Commodity Credit Corporation.
4. The freight transportation charges on all of the involved shipments have been paid and are not here disputed. The dispute in suit relates solely to a claim for demurrage charges on cars containing the shipments of cottonseed oil released by the National Molasses Company to the railroad after the expiration of free time. The dollar amount of plaintiff’s claim is not disputed. If plaintiff is entitled to recover it is entitled to judgment for $12,981; otherwise the petition should be dismissed.
5. Plaintiff contends that the demurrage charges arose on the shipments in question under the provisions of the National Car Demurrage tariffs, which are identical in all material respects to those of Tariff 4r-A. These provisions were in effect during the dates of the shipments herein.
6. Pursuant to the provisions of Tariff 4-A, the National Molasses Company and the plaintiff entered into Car De-murrage Average Agreements, which agreements were in effect at the time of the shipments in suit and applied to Port Richmond and Port Reading.
*734 7. Section G-2 of Rule No. 9 of Tariff 4-A provides:
2. Cars consigned, reconsigned, or ordered to a public elevator, public warehouse, cotton compress, processing or fabricating plant, serving various parties, shall be combined in one average agreement, and the party signing the agreement as principal shall assume responsibility for all demurrage assessable thereunder.
8. It is plaintiff’s contention that defendant is liable for demurrage charges and that the shipments in suit are not covered by any average agreement, entered into pursuant to Tariff 4-A between the National Molasses Company and plaintiff, because National Molasses Company is a private and not a public elevator, public warehouse or facility such as described in said tariff. Defendant denies liability to plaintiff railroad for any demurrage charges on shipments in suit and asserts that those charges are the responsibility of the National Molasses Company which it further asserts is a public warehouse or elevator serving various parties under the tariff. The parties have stipulated that the issue in suit is whether the National Molasses Company is a public or private elevator, warehouse, or other facility within the terms of the applicable tariff quoted above. The evidence is undisputed that the facilities of the National Molasses Company at Port Richmond and Port Reading were not a cotton compress, processing or fabricating plant nor were they capable of storing grain.
9. The National Molasses Company is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. When chartered in 1931 the Articles of Incorporation described its purpose as follows:
Said corporation is formed for the purpose of manufacturing, buying, selling, exporting, importing and generally dealing and trading in molasses, honey, cottonseed meal, stock feeds, sugar by-products, and any and all cognate articles of commerce or commodities.
The principal business of this company is the purchase of blackstrap molasses on its own behalf which is stored in its facilities located around the country.
10. In March 1952 the National Molasses Company amended its Articles of Incorporation to include operations *735 on fluid articles which could be handled more or less in the same manner as molasses. The purpose of the company was described in the Articles of Amendment as follows:
Said corporation is formed for the purpose of manufacturing, buying, selling, exporting, importing, storage of and warehousing and all incidental functions and generally dealing and trading in molasses, honey, cottonseed meal, stock feeds, sugar by-products, and any and all cognate articles of commerce or commodities.
11. During 1953 and 1954, the National Molasses Company had storage facilities at Port Richmond, Pennsylvania, and Port Reading, New Jersey. The facilities at Port Richmond were the larger and consisted of between 23 and 25 storage tanks of various capacities from 100,000 gallons per tank to iy2 million gallons per tank. The facilities at Port Reading consisted of two large tanks of 1-million-gallon capacity each and some smaller tanks. The number of the latter tanks and their capacities are not in the record.
12. Prior to 1952 the facilities at Port Richmond and Port Reading were used exclusively by National Molasses Company for storage of its own product. Thereafter, in 1953 and 1954, because it then had some surplus storage capacity and was authorized to do so by its amended articles, the company contracted to provide storage for three other parties, including defendant, when satisfied that to do so would not interfere with its principal business of handling black-strap molasses.
13. The Jacob Stem Company was a tallow rendering company in Philadelphia and was known to National Molasses by reason of its sharing a platform scale at Port Richmond where they were business neighbors. During 1953 and 1954, the tallow business operated by J acob Stern had a surge and it approached National Molasses to see whether an arrangement could be made for the use of some of the facilities of the latter company. A contract was entered into to lease a tank to the J acob Stem Company.
14. During the same period an arrangement was also made with the Wyandotte Chemical Company for storage of caustic soda which was then distributed from the storage tanks by tank tracks. The only contracts which National Molasses *736 had for storage were the Stem, Wyandotte and Commodity Credit Corporation contracts. In each case the company would set aside a specific tank or tanks for the use of these parties and would remove their stored products on request. The price for storage of materials for others was agreed to by negotiations between the parties in each case.
15. The National Molasses Company carried insurance to cover only its own product and did not protect the commodities stored by other firms from loss due to possible disasters such as fire. National Molasses Company did execute a performance bond in favor of defendant in 1952 for $300,000, subsequently increased to $100,000 and later reduced to $100,000 in 1953.
16. The National Molasses Company has never published tariffs or rates with respect to charges that would be made for the storage of any materials in their facilities at either Port Richmond or Port Reading. The company has never been licensed as a public warehouse, cotton compress or industrial plant by the States of New Jersey or Pennsylvania or any political subdivision thereof. This company never held itself out to the public as willing to store materials at any published rates, but on the contrary, negotiated contracts for storage only by the three concerns identified above so far as the evidence shows. The quantity of materials handled and stored for Stern, Wyandotte Chemical and defendant during the years in issue approximated 1 percent of the materials National Molasses Company handled and stored for its own account.
17. On December 16, 1953, Joseph J. Reidinger of the National Molasses Company wrote the United States Department of Agriculture, Commodity Stabilization Office, concerning one of the demurrage bills in suit. The letter stated:
We are enclosing car demurrage bill No. M-174 dated December 12, 1953 covering 16 cars of Refined Cottonseed Oil unloaded at our Port Reading Terminal, Car-teret, New Jersey. This bill is in the amount of $139.05. We have arranged with the Reading Company to allow your office to receive the benefits of our Demurrage Average Agreement.
You will note that the demurrage is for coverage of three days from the date of arrival to the date of un *737 loading. The reason for this delay was that M. J. Car-pinello Company, 2 Broadway, New York City, New York, was not always able to dispatch a man promptly to supervise the heavy weighing of the tank cars upon the date of the cars’ arrival. The M. J. Carpinello Company was designated by your office as the official weigh master to supervise the heavy and light weighing of each car arriving at our Port Reading Terminal.
We would appreciate your office advising the Reading Company that you have received this demurrage bin and will review and consider the same for payment. Thank you for your cooperation in this matter.
18. On January 20, 1954, W. W. Rhoads, Vice President of Reading Company, wrote to the National Molasses Company, Oreland, Pennsylvania, concerning the demurrage bills in suit as follows:
I am enclosing copies of the following Port Richmond, Philadelphia, Pa., and Port Reading, N.J., De-murrage Bills rendered against your company covering cars released during the months of May, June, August and September 1953, at Port Richmond, Philadelphia, and July, August, September and November 1953, at Port Reading, N.J., under your Demurrage Average Agreement.
*****
The original bills were submitted to you by our Agents and I understand you forwarded them to the United States Department of Agriculture, Commodity Stabilization Service, New Orleans, Louisiana, for payment.
Mr. F. P. Biggs, Director, CSS Commodity Office, and Mr. O. W. Salisbury, Acting Chief, Traffic Management Division, New Orleans, Louisiana, declined payment of the demurrage charges, advising us that we must collect from the party whose average agreement the cars were handled under.
As these bills cover cars released under your Demur-rage Average Agreement, we must look to you for prompt payment, otherwise we will be compelled to take whatever action necessary to enforce collection.
19. On January 26, 1954, Joseph J. Reidinger of the National Molasses Company wrote the Director, United States Department of Agriculture, Commodity Stabilization Service, concerning the aforementioned letter of January 20, *738 1954, and contracts A-2pm(Ow) 141 and A-2pm(Ow)268, as follows:
On January 20, 1954 we received a letter from the Beading Company, a copy of which is enclosed herewith. This letter refers to eight demurrage bills covering charges incurred from June 15, 1953 through November 30, 1953. According to this letter you advised the Beading Company that they must collect these charges from the party whose Demurrage Average Agreement the cars were handled under. This is the first advice we have had as to the status of the subject demurrage bills. We are quite willing to honor these demurrage bills for the account of the U.S. Department of Agriculture, Commodity Stabilization Service, with the understanding that your office will, upon our presentation of properly certified paid invoices, reimburse us. The last time we paid a demurrage bill for your account was June 22,1958 in the amount of $2,693.24. We submitted a voucher, properly supported by a receipted invoice from the Beading Company to your office on August 10, 1953 and as of the present date have not heard as to the status of our invoice.
The unpaid demurrage bills in question were submitted to your office with a detailed explanation as to how and why the demurrage was incurred. In all cases these charges were incurred due to lack of official grades and/ or inability of official weigh masters to certify heavy weighing within a reasonable time after cars arrive at our facilities.
In view of the fact that it has been at least five months since we submitted our claim in the amount of $2,693.24 and have not heard from your office as to its status, we are hesitant to honor charges in the amount of $14,915.43, unless we receive positive assurance from your office that prompt consideration and payment will be given our claim.
We would appreciate hearing from you at an early date. Thank you for your cooperation in this matter.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on its claim, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of twelve thousand nine hundred and eighty-one dollars ($12,981.00).